ERNEST·RAMIREZ AND ADELE RAMIREZ, PLAINTIFFS-RE-SPONDENTS, v. AUTOSPORT, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued December 14, 1981—Decided February 4, 1982.

Leonard Rosenstein argued the cause for appellant (*Feuerstein, Sachs & Maitlin*, attorneys).

Leo Kaplowitz argued the cause for respondents (*Kaplowitz & Wise*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case raises several issues under the Uniform Commercial Code ("the Code" and "UCC") concerning whether a buyer may reject a tender of goods with minor defects and whether a seller may cure the defects. We consider also the remedies available to the buyer, including cancellation of the contract. The main issue is whether plaintiffs, Mr. and Mrs. Ramirez, could reject the tender by defendant, Autosport, of a camper van with minor defects and cancel the contract for the purchase of the van.

The trial court ruled that Mr. and Mrs. Ramirez rightfully rejected the van and awarded them the fair market value of their trade-in van. The Appellate Division affirmed in a brief *per curiam* decision which, like the trial court opinion, was unreported. We affirm the judgment of the Appellate Division.

I

Following a mobile home show at the Meadowlands Sports Complex, Mr. and Mrs. Ramirez visited Autosport's showroom in Somerville. On July 20, 1978 the Ramirezes and Donald Graff, a

salesman for Autosport, agreed on the sale of a new camper and the trade-in of the van owned by Mr. and Mrs. Ramirez. Autosport and the Ramirezes signed a simple contract reflecting a $14,100 purchase price for the new van with a $4,700 trade-in allowance for the Ramirez van, which Mr. and Mrs. Ramirez left with Autosport. After further allowance for taxes, title and documentary fees, the net price was $9,902. Because Autosport needed two weeks to prepare the new van, the contract provided for delivery on or about August 3, 1978.

On that date, Mr. and Mrs. Ramirez returned with their checks to Autosport to pick up the new van. Graff was not there so Mr. White, another salesman, met them. Inspection disclosed several defects in the van. The paint was scratched, both the electric and sewer hookups were missing, and the hubcaps were not installed. White advised the Ramirezes not to accept the camper because it was not ready.

Mr. and Mrs. Ramirez wanted the van for a summer vacation and called Graff several times. Each time Graff told them it was not ready for delivery. Finally, Graff called to notify them that the camper was ready. On August 14 Mr. and Mrs. Ramirez went to Autosport to accept delivery, but workers were still touching up the outside paint. Also, the camper windows were open, and the dining area cushions were soaking wet. Mr. and Mrs. Ramirez could not use the camper in that condition, but Mr. Leis, Autosport's manager, suggested that they take the van and that Autosport would replace the cushions later. Mrs. Ramirez counteroffered to accept the van if they could withhold $2,000, but Leis agreed to no more than $250, which she refused. Leis then agreed to replace the cushions and to call them when the van was ready.

On August 15, 1978 Autosport transferred title to the van to Mr. and Mrs. Ramirez, a fact unknown to them until the summer of 1979. Between August 15 and September 1, 1978 Mrs. Ramirez called Graff several times urging him to complete the preparation of the van, but Graff constantly advised her

that the van was not ready. He finally informed her that they could pick it up on September 1.

When Mr. and Mrs. Ramirez went to the showroom on September 1, Graff asked them to wait. And wait they did—for one and a half hours. No one from Autosport came forward to talk with them, and the Ramirezes left in disgust.

On October 5, 1978 Mr. and Mrs. Ramirez went to Autosport with an attorney friend. Although the parties disagreed on what occurred, the general topic was whether they should proceed with the deal or Autosport should return to the Ramirezes their trade-in van. Mrs. Ramirez claimed they rejected the new van and requested the return of their trade-in. Mr. Lustig, the owner of Autosport, thought, however, that the deal could be salvaged if the parties could agree on the dollar amount of a credit for the Ramirezes. Mr. and Mrs. Ramirez never took possession of the new van and repeated their request for the return of their trade-in. Later in October, however, Autosport sold the trade-in to an innocent third party for $4,995. Autosport claimed that the Ramirez' van had a book value of $3,200 and claimed further that it spent $1,159.62 to repair their van. By subtracting the total of those two figures, $4,159.62, from the $4,995.00 sale price, Autosport claimed a $600–700 profit on the sale.

On November 20, 1978 the Ramirezes sued Autosport seeking, among other things, rescission of the contract. Autosport counterclaimed for breach of contract.

## II

Our initial inquiry is whether a consumer may reject defective goods that do not conform to the contract of sale. The basic issue is whether under the UCC, adopted in New Jersey as *N.J.S.A.* 12A:1–101 *et seq.*, a seller has the duty to deliver goods that conform precisely to the contract. We conclude that the seller is under such a duty to make a "perfect tender" and that a buyer has the right to reject goods that do not conform to the

contract. That conclusion, however, does not resolve the entire dispute between buyer and seller. A more complete answer requires a brief statement of the history of the mutual obligations of buyers and sellers of commercial goods.

In the nineteenth century, sellers were required to deliver goods that complied exactly with the sales agreement. *See Filley v. Pope*, 115 *U.S.* 213, 220, 6 *S.Ct.* 19, 21, 29 *L.Ed.* 372, 373 (1885) (buyer not obliged to accept otherwise conforming scrap iron shipped to New Orleans from Leith, rather than Glasgow, Scotland, as required by contract); *Columbian Iron Works & Dry-Dock Co. v. Douglas*, 84 *Md.* 44, 47, 34 *A.* 1118, 1120–1121 (1896) (buyer who agreed to purchase steel scrap from United States cruisers not obliged to take any other kind of scrap). That rule, known as the "perfect tender" rule, remained part of the law of sales well into the twentieth century. By the 1920's the doctrine was so entrenched in the law that Judge Learned Hand declared "[t]here is no room in commercial contracts for the doctrine of substantial performance." *Mitsubishi Goshi Kaisha v. J. Aron & Co., Inc.*, 16 *F.*2d 185, 186 (2 Cir. 1926).

The harshness of the rule led courts to seek to ameliorate its effect and to bring the law of sales in closer harmony with the law of contracts, which allows rescission only for material breaches. *LeRoy Dyal Co. v. Allen*, 161 *F.*2d 152, 155 (4 Cir. 1947). *See* 5 Corbin, *Contracts* § 1104 at 464 (1951); 12 Williston, *Contracts* § 1455 at 14 (3 ed. 1970). Nevertheless, a variation of the perfect tender rule appeared in the Uniform Sales Act. *N.J.S.A.* 46:30–75 (purchasers permitted to reject goods or rescind contracts for any breach of warranty); *N.J.S.A.* 46:30–18 to –21 (warranties extended to include all the seller's obligations to the goods). *See* Honnold, "Buyer's Right of Rejection, A Study in the Impact of Codification Upon a Commercial Problem", 97 *U.Pa.L.Rev.* 457, 460 (1949). The chief objection to the continuation of the perfect tender rule was that buyers in a declining market would reject goods for minor nonconformities and force the loss on surprised sellers. *See* Hawkland, *Sales and Bulk Sales Under the Uniform Commercial*

*Code*, 120–122 (1958), cited in *N.J.S.A.* 12A:2–508, New Jersey Study Comment 3.

To the extent that a buyer can reject goods for any nonconformity, the UCC retains the perfect tender rule. Section 2–106 states that goods conform to a contract "when they are in accordance with the obligations under the contract". *N.J.S.A.* 12A:2–106. Section 2–601 authorizes a buyer to reject goods if they "or the tender of delivery fail in any respect to conform to the contract". *N.J.S.A.* 12A:2–601. The Code, however, mitigates the harshness of the perfect tender rule and balances the interests of buyer and seller. *See Restatement (Second), Contracts*, § 241 comment (b) (1981). The Code achieves that result through its provisions for revocation of acceptance and cure. *N.J.S.A.* 12A:2–608, 2–508.

Initially, the rights of the parties vary depending on whether the rejection occurs before or after acceptance of the goods. Before acceptance, the buyer may reject goods for any nonconformity. *N.J.S.A.* 12A:2–601. Because of the seller's right to cure, however, the buyer's rejection does not necessarily discharge the contract. *N.J.S.A.* 12A:2–508. Within the time set for performance in the contract, the seller's right to cure is unconditional. *Id.*, subsec. (1); *see id.*, Official Comment 1. Some authorities recommend granting a breaching party a right to cure in all contracts, not merely those for the sale of goods. *Restatement (Second), Contracts*, ch. 10, especially §§ 237 and 241. Underlying the right to cure in both kinds of contracts is the recognition that parties should be encouraged to communicate with each other and to resolve their own problems. Id., Introduction p. 193.

The rights of the parties also vary if rejection occurs after the time set for performance. After expiration of that time, the seller has a further reasonable time to cure if he believed reasonably that the goods would be acceptable with or without a money allowance. *N.J.S.A.* 12A:2–508(2). The determination of what constitutes a further reasonable time depends on the

surrounding circumstances, which include the change of position by and the amount of inconvenience to the buyer. *N.J.S.A.* 12A:2–508, Official Comment 3. Those circumstances also include the length of time needed by the seller to correct the nonconformity and his ability to salvage the goods by resale to others. *See Restatement (Second), Contracts,* § 241 comment (d). Thus, the Code balances the buyer's right to reject nonconforming goods with a "second chance" for the seller to conform the goods to the contract under certain limited circumstances. *N.J.S.A.* 12A:2–508, New Jersey Study Comment 1.

After acceptance, the Code strikes a different balance: the buyer may revoke acceptance only if the nonconformity substantially impairs the value of the goods to him. *N.J.S.A.* 12A:2–608. *See Herbstman v. Eastman Kodak Co.,* 68 *N.J.* 1, 9 (1975). *See generally,* Priest, "Breach and Remedy for the Tender of Non-Conforming Goods under the Uniform Commercial Code: An Economic Approach," 91 *Harv.L.Rev.* 960, 971–973 (1978). This provision protects the seller from revocation for trivial defects. *Herbstman, supra,* 68 *N.J.* at 9. It also prevents the buyer from taking undue advantage of the seller by allowing goods to depreciate and then returning them because of asserted minor defects. *See* White & Summers, *Uniform Commercial Code,* § 8–3 at 391 (2 ed. 1980). Because this case involves rejection of goods, we need not decide whether a seller has a right to cure substantial defects that justify revocation of acceptance. *See Pavesi v. Ford Motor Co.,* 155 *N.J.Super.* 373, 378 (App.Div.1978) (right to cure after acceptance limited to trivial defects) and White & Summers, *supra,* § 8–4 at 319 n.76 (open question as to the relationship between §§ 2–608 and 2–508).

Other courts agree that the buyer has a right of rejection for any nonconformity, but that the seller has a countervailing right to cure within a reasonable time. *Marine Mart Inc. v. Pearce,* 252 *Ark.* 601, 480 *S.W.*2d 133, 137 (1972). *See Intermeat, Inc. v. American Poultry, Inc.,* 575 *F.*2d 1017, 1024 (2 Cir. 1978); *Moulton Cavity & Mold., Inc. v. Lyn-Flex Industries,* 396 *A.*2d 1024,

1027 n.6 (Me.1979); *Uchitel v. F. R. Tripler & Co.*, 107 *Misc.*2d 310, 316, 434 *N.Y.S.*2d 77, 81 (App.Term 1980); *Rutland Music Services, Inc. v. Ford Motor Co.*, 422 *A.*2d 248, 249 (Vt.1980). *But see McKenzie v. Alla-Ohio Coals, Inc.*, 29 *U.C.C.Rep.* 852, 856–857 (D.D.C.1979).

■ One New Jersey case, *Gindy Mfg. Corp. v. Cardinale Trucking Corp.*, suggests that, because some defects can be cured, they do not justify rejection. 111 *N.J.Super.* 383, 387 n.1 (Law Div.1970). *Accord, Adams v. Tremontin*, 42 *N.J.Super.* 313, 325 (App.Div.1956) (Uniform Sales Act). *But see Sudol v. Rudy Papa Motors*, 175 *N.J.Super.* 238, 240–241 (D.Ct.1980) (§ 2–601 contains perfect tender rule). Nonetheless, we conclude that the perfect tender rule is preserved to the extent of permitting a buyer to reject goods for any defects. Because of the seller's right to cure, rejection does not terminate the contract. Accordingly, we disapprove the suggestion in *Gindy* that curable defects do not justify rejection.

A further problem, however, is identifying the remedy available to a buyer who rejects goods with insubstantial defects that the seller fails to cure within a reasonable time. The Code provides expressly that when "the buyer rightfully rejects, then with respect to the goods involved, the buyer may cancel." *N.J.S.A.* 12A:2–711. "Cancellation" occurs when either party puts an end to the contract for breach by the other. *N.J.S.A.* 12A:2–106(4). Nonetheless, some confusion exists whether the equitable remedy of rescission survives under the Code. *Compare Ventura v. Ford Motor Corp.*, 173 *N.J.Super.* 501, 503 (Ch.Div.1980), *aff'd* 180 *N.J.Super.* 45 (App.Div.1981) (rescission under UCC) *and Pavesi v. Ford Motor Corp., supra*, 155 *N.J.Super.* at 377 (equitable remedies still available since not specifically superceded, § 1–103) *with Edelstein v. Toyota Motors Dist.*, 176 *N.J.Super.* 57, 63–64 (App.Div.1980) (under UCC rescission is revocation of acceptance) *and Sudol v. Rudy Papa Motors, supra*, 175 *N.J.Super.* at 241–242 (under UCC, rescission no longer exists as such).

The Code eschews the word "rescission" and substitutes the terms "cancellation", "revocation of acceptance", and "rightful rejection". *N.J.S.A.* 12A:2–106(4); 2–608; and 2–711 & Official Comment 1. Although neither "rejection" nor "revocation of acceptance" is defined in the Code, rejection includes both the buyer's refusal to accept or keep delivered goods and his notification to the seller that he will not keep them. White & Summers, *supra*, § 8–1 at 293. Revocation of acceptance is like rejection, but occurs after the buyer has accepted the goods. Nonetheless, revocation of acceptance is intended to provide the same relief as rescission of a contract of sale of goods. *N.J.S.A.* 12A:2–608 Official Comment 1; N.J. Study Comment 2. In brief, revocation is tantamount to rescission. *See Herbstman v. Eastman Kodak Co., supra,* 68 *N.J.* at 9; *accord, Peckham v. Larsen Chevrolet-Buick-Oldsmobile, Inc.,* 99 *Idaho* 675, 677, 587 *P.*2d 816, 818 (1978) (rescission and revocation of acceptance amount to the same thing). Similarly, subject to the seller's right to cure, a buyer who rightfully rejects goods, like one who revokes his acceptance, may cancel the contract. *N.J.S.A.* 12A:2–711 & Official Comment 1. We need not resolve the extent to which rescission for reasons other than rejection or revocation of acceptance, *e.g.* fraud and mistake, survives as a remedy outside the Code. *Compare N.J.S.A.* 12A:1–103 *and* White & Summers, *supra,* § 8–1, p. 295, *with N.J.S.A.* 12A:2–721. Accordingly, we approve *Edelstein* and *Sudol,* which recognize that explicit Code remedies replace rescission, and disapprove *Ventura* and *Pavesi* to the extent they suggest the UCC expressly recognizes rescission as a remedy.

Although the complaint requested rescission of the contract, plaintiffs actually sought not only the end of their contractual obligations, but also restoration to their pre-contractual position. That request incorporated the equitable doctrine of restitution, the purpose of which is to restore plaintiff to as good a position as he occupied before the contract. Corbin, *supra,* § 1102 at 455. In UCC parlance, plaintiffs' request was for the cancella-

tion of the contract and recovery of the price paid. *N.J.S.A.* 12A:2–106(4), 2–711.

■ General contract law permits rescission only for material breaches, and the Code restates "materiality" in terms of "substantial impairment". *See Herbstman v. Eastman Kodak Co., supra,* 68 *N.J.* at 9; *id.* at 15 (Conford, J., concurring). The Code permits a buyer who rightfully rejects goods to cancel a contract of sale. *N.J.S.A.* 12A:2–711. Because a buyer may reject goods with insubstantial defects, he also may cancel the contract if those defects remain uncured. Otherwise, a seller's failure to cure minor defects would compel a buyer to accept imperfect goods and collect for any loss caused by the nonconformity. *N.J.S.A.* 12A:2–714.

■ Although the Code permits cancellation by rejection for minor defects, it permits revocation of acceptance only for substantial impairments. That distinction is consistent with other Code provisions that depend on whether the buyer has accepted the goods. Acceptance creates liability in the buyer for the price, *N.J.S.A.* 12A:2–709(1), and precludes rejection. *N.J.S.A.* 12A:2–607(2); *N.J.S.A.* 12A:2–606, New Jersey Study Comment 1. Also, once a buyer accepts goods, he has the burden to prove any defect. *N.J.S.A.* 12A:2–607(4); White & Summers, *supra,* § 8–2 at 297. By contrast, where goods are rejected for not conforming to the contract, the burden is on the seller to prove that the nonconformity was corrected. *Miron v. Yonkers Raceway, Inc.,* 400 *F.*2d 112, 119 (2 Cir. 1968).

Underlying the Code provisions is the recognition of the revolutionary change in business practices in this century. The purchase of goods is no longer a simple transaction in which a buyer purchases individually-made goods from a seller in a face-to-face transaction. Our economy depends on a complex system for the manufacture, distribution, and sale of goods, a system in which manufacturers and consumers rarely meet. Faceless manufacturers mass-produce goods for unknown consumers who purchase those goods from merchants exercising

little or no control over the quality of their production. In an age of assembly lines, we are accustomed to cars with scratches, television sets without knobs and other products with all kinds of defects. Buyers no longer expect a "perfect tender". If a merchant sells defective goods, the reasonable expectation of the parties is that the buyer will return those goods and that the seller will repair or replace them.

Recognizing this commercial reality, the Code permits a seller to cure imperfect tenders. Should the seller fail to cure the defects, whether substantial or not, the balance shifts again in favor of the buyer, who has the right to cancel or seek damages. *N.J.S.A.* 12A:2–711. In general, economic considerations would induce sellers to cure minor defects. *See generally* Priest, *supra*, 91 *Harv.L.Rev.* 973–974. Assuming the seller does not cure, however, the buyer should be permitted to exercise his remedies under *N.J.S.A.* 12A:2–711. The Code remedies for consumers are to be liberally construed, and the buyer should have the option of cancelling if the seller does not provide conforming goods. *See N.J.S.A.* 12A:1–106.

To summarize, the UCC preserves the perfect tender rule to the extent of permitting a buyer to reject goods for any nonconformity. Nonetheless, that rejection does not automatically terminate the contract. A seller may still effect a cure and preclude unfair rejection and cancellation by the buyer. *N.J. S.A.* 12A:2–508, Official Comment 2; *N.J.S.A.* 12A:2–711, Official Comment 1.

### III

The trial court found that Mr. and Mrs. Ramirez had rejected the van within a reasonable time under *N.J.S.A.* 12A:2–602. The court found that on August 3, 1978 Autosport's salesman advised the Ramirezes not to accept the van and that on August 14, they rejected delivery and Autosport agreed to replace the cushions. Those findings are supported by substantial credible evidence, and we sustain them. *See Rova Farms*

*Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–484 (1974). Although the trial court did not find whether Autosport cured the defects within a reasonable time, we find that Autosport did not effect a cure. Clearly the van was not ready for delivery during August, 1978 when Mr. and Mrs. Ramirez rejected it, and Autosport had the burden of proving that it had corrected the defects. Although the Ramirezes gave Autosport ample time to correct the defects, Autosport did not demonstrate that the van conformed to the contract on September 1. In fact, on that date, when Mr. and Mrs. Ramirez returned at Autosport's invitation, all they received was discourtesy.

■ On the assumption that substantial impairment is necessary only when a purchaser seeks to revoke acceptance under *N.J.S.A.* 12A:2–608, the trial court correctly refrained from deciding whether the defects substantially impaired the van. The court properly concluded that plaintiffs were entitled to "rescind"—*i.e.*, to "cancel"—the contract.

■ Because Autosport had sold the trade-in to an innocent third party, the trial court determined that the Ramirezes were entitled not to the return of the trade-in, but to its fair market value, which the court set at the contract price of $4,700. A buyer who rightfully rejects goods and cancels the contract may, among other possible remedies, recover so much of the purchase price as has been paid. *N.J.S.A.* 12A:2–711. The Code, however, does not define "pay" and does not require payment to be made in cash.

A common method of partial payment for vans, cars, boats and other items of personal property is by a "trade-in". When concerned with used vans and the like, the trade-in market is an acceptable, and perhaps the most appropriate, market in which to measure damages. It is the market in which the parties dealt; by their voluntary act they have established the value of the traded-in article. *See Frantz Equipment Co. v. Anderson*, 37 *N.J.* 420, 431–432 (1962) (in computing purchaser's damages for alleged breach of uniform conditional sales law, trade-in value

of tractor was appropriate measure); *accord, California Airmotive Corp. v. Jones*, 415 *F*.2d 554, 556 (6 Cir. 1969). In other circumstances, a measure of damages other than the trade-in value might be appropriate. *See Chemical Bank v. Miller Yacht Sales*, 173 *N.J.Super.* 90, 103 (App.Div.1980) (in determining value of security interest in boat, court rejected both book value and contract trade-in value and adopted resale value as appropriate measure of damages).

 The ultimate issue is determining the fair market value of the trade-in. This Court has defined fair market value as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." *In re Estate of Romnes*, 79 *N.J.* 139, 144 (1978). Although the value of the trade-in van as set forth in the sales contract was not the only possible standard, it is an appropriate measure of fair market value.

For the preceding reasons, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.