216 N.J. Super. 313 (1987)
523 A.2d 695
GENERAL MOTORS ACCEPTANCE CORPORATION, PLAINTIFF-RESPONDENT,
v.
STANLEY JANKOWITZ, DEFENDANT-THIRD-PARTY PLAINTIFF-APPELLANT,
v.
POTAMKIN CADILLAC CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT, AND GENERAL MOTORS CORPORATION, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 16, 1986.
Decided April 1, 1987.
*318 Before Judges KING and DEIGHAN.
Smith & Fenmore, attorneys for appellant Jankowitz (Arthur T. Smith, Jr., on the brief).
Zavesky, Kelly & Madden, attorneys for respondent Potamkin Cadillac Corp. (Joseph E. Zavesky, on the brief).
Psak & Parker, attorneys for respondent General Motors Acceptance Corporation (John R. Parker, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
On this appeal we are required to determine whether, under the facts of this case, the purchaser of a new automobile may revoke acceptance for defects in the electrical system when the *319 seller, after several unsuccessful attempts to cure the defects, was, according to the buyer, unable to do so. If the acceptance was properly revoked, the measure and sufficiency of proof of damages thereof must be determined. Also involved is the question of whether there was an effective waiver of implied warranties under the Uniform Commercial Code, Sales, N.J.S.A. 12A:2-101 et seq., and the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, (Magnuson-Moss Act) 15 U.S.C.A. § 2301 et seq.
Defendant-third-party plaintiff Stanley Jankowitz appeals from a judgment of involuntary dismissal entered at the close of all of the evidence, R. 4:37-2(b) and R. 4:40-1, in a trial by jury. A judgment was entered against defendant in the total amount of $4,410.83 which included repossession costs, registration and reselling charges in the amount of $362.50, $750 attorneys fees and $969.04 prejudgment interest. In addition, his counterclaim against plaintiff General Motors Acceptance Corporation (GMAC) and third-party complaint against Potamkin Cadillac Corporation (Potamkin) were dismissed. We reverse.
GMAC instituted an action against Jankowitz for a default in monthly payments under a retail installment contract for the purchase of a 1982 Cadillac from Potamkin. He counterclaimed against GMAC and filed third-party complaints against General Motors Corporation (GM) as manufacturer and Potamkin as the dealer for rescission, compensatory and punitive damages, breach of contract, misrepresentation, negligence, breach of warranty and fraud. He contended that the Cadillac had a defective electrical system which, despite repeated attempts to repair by Potamkin, continued to malfunction. Defendant maintained that he revoked the acceptance of the automobile and tendered it back to Potamkin and GM.
Prior to trial the complaint was dismissed for failure to answer interrogatories propounded by GMAC and GM. Subsequently, Jankowitz's application to reinstate the third-party *320 complaint as to Potamkin was granted. However, since no application was made to reinstate the third-party complaint against GM, and no appeal has been taken from that dismissal, GM is not a party to this appeal. At the conclusion of all the evidence Jankowitz consented to a dismissal of the claim for punitive damages as to GMAC. Applications by both GMAC and Potamkin for dismissal of claims for negligence, fraud and misrepresentation were also granted. The only remaining issues, which were subsequently decided by the trial judge, were the extent of warranties made, application of the Magnuson-Moss Act, and whether Jankowitz was entitled to relief under the Uniform Commercial Code.
The following facts were developed at trial. Jankowitz purchased a new 1982 Cadillac from Potamkin in New York on April 16, 1982. He received a credit of $1,852.18 for the equity on the trade-in of his 1981 Cadillac and entered into a retail installment contract for the balance of the purchase price in the sum of $14,027.67, payable in 36 monthly installments of $471.77. Potamkin assigned its rights under the contract to GMAC.
About one week after he purchased the car, the cruise control failed to operate properly and the warning light on the dashboard flashed "stop engine." On April 23, 1982, he returned the car to Potamkin for service. On May 18, 1982, after redelivery of the car, Jankowitz again experienced problems when the "stop engine" light again flashed on as did the "generator" warning light. He returned the car to Potamkin. The work order to the service department on this occasion directed that the electrical system be checked and repaired and that the generator be overhauled.
On May 20, 1982, the day after Jankowitz picked up the car, the "stop engine" and "generator" light again flashed on and, for the third time, he returned the car to Potamkin. The service manager also told him that there was a problem with the electrical system which was indicated by a "code 16" from *321 the computer on the dashboard. The service manager explained to Jankowitz that "code 16" indicates a problem with the electrical system. The work order indicated that there was excessive generator output and that the generator needed to be overhauled.
After receiving the car Jankowitz experienced the same problem on May 24, while he was crossing the George Washington Bridge. At that time the lights went out, then came back on, the "stop engine" light and generator light went on and the vehicle "cut out". Once more the car was returned to Potamkin. The work order for this service repair indicated, among other things, that on a road test, the car "cut out." The work order again indicated "code 16" and also stated that the ECM (electronic control module) was replaced. Jankowitz testified that the car had stalled on two previous occasions. On one occasion the car "cut out" while he was driving to Rockland County, New York.
After the car was serviced, on June 7th Jankowitz experienced the same problem. On this occasion, Potamkin sent a flat bed truck to return the vehicle to its repair shop. The work order for that date indicates that Potamkin was unable to read any information on the ECM so they replaced it as well as the alternator and made some other repairs.
Jankowitz had similar problems on June 17 and June 22. On June 23 he informed the salesman who sold the car to him as well as the sales manager of Potamkin, GMAC and General Motors Cadillac Division in Detroit that he no longer wanted the car and told them to take it back. He left the car, which he said had 2,700 miles on the odometer, in front of his home in Fort Lee, New Jersey. On the same date he purchased a new Mercedes and testified that he never used the Cadillac again.
Jankowitz made two payments on his car in May and June but defaulted on the third payment due in July 1982. On January 6, 1983, GMAC instituted this action against Jankowitz. On April 13, 1983, a consent order was entered directing *322 Jankowitz to deposit into an escrow account $4,291.93 representing the amount past due on the account, and directing that he pay the $471.77 monthly payments commencing April 16, 1983. Apparently Jankowitz failed to make the required deposit or payments. Accordingly, on May 27, 1983, a writ of replevin was issued for the Cadillac, directing Jankowitz to surrender possession of it to GMAC and permitting GMAC to repossess and sell the car in a commercially reasonable manner. At trial, Charles Knast, special collections manager for GMAC, testified that the car was not repossessed until July, 1983. While there is no testimony concerning the reason for the delay for over a year in repossessing and selling the vehicle, it is indicated during that period of time there were some negotiations between Jankowitz or his attorney and GMAC for a return of the vehicle which apparently fell through.
Charles Knast testified that the Cadillac was picked up at an address in Oradell, New Jersey in July, 1983. It was taken to Bronx, New York where GMAC stores its repossessed automobiles. At the time the car was picked up the odometer read 3,213 miles. Knast testified that on June 17, 1982, the last date that the Cadillac was taken by Jankowitz to be serviced by Potamkin, the work order for service noted the mileage on the odometer was 2,164 miles. The car was sold at auction to a wholesale dealer on July 12, 1983 for $12,950. Knast further testified that GMAC did not make any repairs to prepare the car for sale and that it had been driven from where it had been picked up to the place of storage without any difficulty. He also stated that GMAC never received any complaints about the condition of the car from the party who purchased it at auction.
On this appeal Jankowitz contends that (1) there was sufficient credible evidence from which reasonable inferences could have been drawn to support his affirmative claims and defenses under the Uniform Commercial Code (UCC), and (2) the disclaimer of warranties in the Retail Installment Contract does not constitute a valid disclaimer of implied warranties.
*323 GMAC responds and contends that there were no facts to establish that there was a substantial impairment to the value of the car and that the implied warranties were effectively disclaimed under both the UCC and Magnuson-Moss Act but that, in any event, the Magnuson-Moss Act does not apply to GMAC. Potamkin argues that there were insufficient facts to support a recovery for any loss under either the UCC or Magnuson-Moss Act and that there was a failure "to show that the disclaimer of implied warranties set forth in the retail installment contract did not apply to Potamkin."

I
The retail installment contract contained the following language on its reverse side:

Warranties You [Potamkin?] Disclaim. I [Jankowitz?] understand that there are no implied warranties of merchantability, fitness for a particular purpose, or other warranties, express or implied, covering the vehicle unless:
1. it is of a type normally used for personal use, and
2. was manufactured after July 3, 1975, and
3. you [Potamkin?] extend your written warranty or service contract within 90 days from the date of this contract.

Warranty You [Potamkin] May Provide. If you [Potamkin] offer a written warranty or service contract within 90 days from the date of this contract, any implied warranty which applies to the vehicle lasts only as long as the warranty or service contract.
The 1982 Cadillac new car warranty information by GM contains a limited warranty which states:
Cadillac Motor Car Division General Motors Corporation warrants each new 1982 car.
DEFECTS This exclusive warranty covers any repairs and needed adjustments to correct defects in materials or workmanship.
REPAIRS Your Cadillac dealer will make the repairs or adjustment using new or remanufactured parts.
WHICHEVER COMES FIRST This warranty is for 12 months or 12,000 miles, whichever comes first.
NO CHARGE Warranty repairs and adjustments (parts and/or labor) will be made at no charge. A reasonable time must be allowed after taking the car to the dealer.
The 1982 Cadillac New Car Warranty Information Brochure contains additional matters concerning "things you should *324 know about the Cadillac new car warranty" and refers to specific information concerning the power train limited warranty, perforation and corrosion warranty as well as information about the Cadillac corrosion warranty and emission control systems warranties. In essence, GM "exclusive[ly] ... warrants each new 1982 car for any repairs and needed adjustments to correct defects in the materials or workmanship ... [by its] Cadillac dealer ... for twelve months or 12,000 miles, whichever comes first ... at no charge."
The warranty on the reverse side of the installment sales contract is a masterpiece of ambiguity, inconsistency and contradictions. The warranty and disclaimer are obviously keyed to the Magnuson-Moss Act. There is a reference to the "personal use" which connotes a consumer product under the Act, 15 U.S.C.A. § 2301-(1) and the reference to the automobile being manufactured after July 3, 1975 is in reference to the effective date of the Act, six months after January 4, 1975. 15 U.S.C.A. § 2312(a). The use of the third person "you" apparently applies to the consumer in one instance and the seller in two instances. It provides "you" (Jankowitz) "understand that there are no implied warranties ... or other warranties, expressed or implied." It then states that "you" (Potamkin) "[may] extend your written warranty [which was previously disclaimed and is not set forth] or service contract within 90 days from the date of this contract." The warranty or service contract is contained, not in the Potamkin warranty, but in the new car warranty of GM. Without committing itself as to whether there even is a warranty or service contract it states that "[i]f you [Potamkin] offer a written warranty [which it disclaims] or a service contract within 90 days from the date of this contract (which is warranted by GM for a period of 12 months or 12,000 miles) [then] any implied warranty (which Potamkin disclaims) which applies to the vehicle lasts only as long as the warranty or service contract."
The trial judge held that Potamkin undertook to do whatever repairs were required under the GM warranty but that it made *325 "no written warranties nor did the Magnuson-Moss Act apply." In granting a judgment of involuntary dismissal, the trial judge held that:
There is no question ..., the General Motors warranty, it is a written warranty by General Motors, it is not a warranty that is made by Potamkin.
Those written warranties are specifically those of General Motors and Potamkin did not make any of those printed warranties. Potamkin just undertook, through Cadillac, as one of its many dealers, to do whatever repairs were required under the warranty in accordance with the terms that Cadillac would reimburse the right of the dealers for whatever warranty work they had to do.
* * * * * * * *
[T]he retail installment contract ... clearly indicates the rights of the parties vis-a-vis any disclaimers or warranties, ... that Potamkin disclaimed, ... [and] that they had made no written warranties. So under the state law and under Magnuson, they are entitled to disclaim any they have.
Under the Magnuson-Moss Act, 15 U.S.C.A. § 2301(6) defines a written warranty as:
(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.
The term "service contract" under the Magnuson-Moss Act means a "contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product." 15 U.S.C.A. § 2301(8).
A supplier is any person engaged in making a consumer product directly or indirectly available to consumers, 15 U.S.C.A. § 2301(4), and a warrantor includes any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty. 15 U.S.C.A. § 2301(5). A supplier or warrantor may enter into a service contract in addition to or in lieu of a written warranty, 15 *326 U.S.C.A. § 2306(b), and a consumer may institute an action for any violation under the Act or a service contract or implied warranties under the UCC. 15 U.S.C.A. § 2310(d)(1). Here, as ambiguous as it may be, Potamkin may have extended a service contract to Jankowitz for a period of 90 days from the date of the contract, but the GM warranty requires Potamkin, as a Cadillac dealer, to make repairs and to correct defects in materials and workmanship for the first 12 months or 12,000 miles, whichever comes first.
Thus, under the Magnuson-Moss Act, Potamkin gave a written warranty or service contract which is inconsistent with a disclaimer of all warranties in violation of the Magnuson-Moss Act. Further, the combination of Potamkin's undertaking and the GM warranty has been interpreted to rebut the disclaimer of implied warranty of merchantability by Potamkin as a dealer. Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 58 (App.Div. 1981), disapproved on other grounds, Ramirez v. Autosport, 88 N.J. 277 (1982). See Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 407-408 (1960). In Henningsen, the reverse side of the purchase contract disclaimed both express and implied warranties by the dealer or manufacturer except the express warranty of the manufacturer. However, the last paragraph of the disclaimer provided that: "The dealer also agrees to promptly perform and fulfill all terms and conditions of the owner service policy." The Supreme Court held that "[p]resumably the intention was to incorporate the policy into the sales contract by reference."[1]Id. at 407. Since Potamkin "passed on," to Jankowitz a warranty from GM, Ventura, 180 N.J. Super. at 57, and as GM's representative for the purpose of *327 making repairs to Jankowitz' vehicle as directed under the GM warranty, Potamkin has adopted that warranty and is liable to Jankowitz for a breach of either expressed or implied warranty. See Ventura, 180 N.J. Super. at 63.

II
The foregoing warranties, disclaimers and limitations must be examined in light of the requirements of both the UCC and the Magnuson-Moss Act. The UCC provides for express warranties regarding the quality of the goods, N.J.S.A. 12A:2-313, and implied warranties of merchantability, N.J.S.A. 12A:2-314, and fitness for a particular purpose, N.J.S.A. 12A:2-315. But the seller may exclude or modify liability for warranties if the exclusion or modification is conspicuous. N.J.S.A. 12A:2-316. Further, as set forth in GMAC's installment sales contract, a seller may limit liability and the buyer's remedy to a repair and replacement of the defective goods or parts, N.J.S.A. 12A:2-719(1)(a), see Herbstman v. Eastman Kodak Co., 68 N.J. 1, 11-12 (1975), 15 U.S.C.A., § 2304(a)(4), or limit or exclude consequential damages, unless the limitation or exclusion is unconscionable. N.J.S.A. 12A:2-719(3). Under the Magnuson-Moss Act, implied warranties may not be disclaimed if written warranties are given, 15 U.S.C.A. § 2308(a), but may be limited to the duration of the written warranty if it was not designated a full warranty, 15 U.S.C.A. § 2304(a)(2), provided that the limitation was conscionable, clear and prominently displayed on the face of the warranty. 15 U.S.C.A. § 2308(b).
A remedy limitation or exclusion restricts the remedies available to the parties if a breach is established. N.J.S.A. 12A:2-719(1)(a); Gladden v. Cadillac Motor Car Div., 83 N.J. 320, 330 (1980); White and Summers, Uniform Commercial Code, (2d ed. 1980), § 12-11 at 472. On the other hand, a disclaimer clause pursuant to N.J.S.A. 12A:2-316 is a device used to control the seller's liability by reducing the number of *328 situations in which the seller may be in breach. Gladden, 83 N.J. at 330; White and Summers, supra at 471-472. The complete exclusion of implied warranties, including warranties of merchantability and of fitness for a particular purpose, is specifically permitted under the UCC. See N.J.S.A. 12A:2-316. Gladden v. Cadillac Motor Car Div., 83 N.J. at 330-331.
The Magnuson-Moss Act provides that a supplier may not disclaim or modify any implied warranty to a consumer if (1) the supplier makes any written warranty to the consumer or (2) at the time of the sale or within 90 days thereafter, the supplier enters into a service contract with the consumer relative to the consumer product. 15 U.S.C.A. § 2308(a)(1), (2). However, if only a limited warranty is given, an implied warranty on the consumer product may be limited to the duration of the limited written warranty if that duration is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty. 15 U.S.C.A. § 2308(b) Any disclaimer, modification or limitation made in violation of these provisions is ineffective for the purpose of any action under the Act or State law. 15 U.S.C.A. § 2308(c).
By these provisions, Congress intended to eliminate the practice of giving an express warranty while at the same time disclaiming implied warranties, a practice which often has the effect of limiting the rights of the consumer rather than expanding them as he might otherwise be led to believe. Am. Jur., Consumer Products Warranty Act, (New Topic Service), § 27 at 14, citing HR No. 93-1107, 93 Cong., 2d Sess. With certain exceptions not applicable herein, where consumer products are involved this provision obviously conflicts with the UCC provisions on warranty disclaimer and prevails over the UCC and over any other State laws which do not afford consumers greater rights, 15 U.S.C.A. § 2311(c)(1)(B), (C), pertaining to contents of warranties, 15 U.S.C.A. § 2302, designation of written warranties, 15 U.S.C.A. § 2303 and federal *329 minimum standards for warranties, 15 U.S.C.A. § 2304. See Am.Jur., supra, § 13.
Under the UCC, where circumstances cause an exclusive or limited remedy to fail of its essential purpose, the buyer has the remedy as provided in N.J.S.A. 12A:2-719(2). Although the limited warranty restricts Potamkin's liability under the GM warranty to repair and replacement of any defects in the automobile, the limited warranty may be deemed fair and reasonable. But if circumstances cause the limited warranty to fail in its essential purpose or operate to deprive a buyer of the substantial value of the bargain, the limitation of warranty clause may not be invoked. In that event, a buyer, such as Jankowitz, may seek remedy under the provisions of the UCC. Id., UCC Comment 1. One of those remedies is the right of a buyer to revoke acceptance of the goods or property. N.J.S.A. 12A:2-608(1); Ramirez v. Autosport, 88 N.J. 277, 288-289 (1982). Under 15 U.S.C.A. § 2310(d)(1) a consumer who is damaged by a breach of a written or implied warranty or service contract may bring suit for damages and "other legal and equitable relief, including attorneys fees." 15 U.S.C.A. at § 2310(d)(1).
The purpose of an exclusive remedy by the seller to replace or repair the defective parts is to give the seller an opportunity to make the goods conform while limiting risks by excluding direct and consequential damages. Beal v. General Motors Corporation., 354 F. Supp. 423, 426 (D.Del. 1973). From the viewpoint of the buyer, the purpose of the exclusive remedy is to provide goods that conform to the contract within a reasonable time after a defective part is discovered. Ibid. Accord Riley v. Ford Motor Company., 442 F.2d 670, 671 (5th Cir.1971). In other words, the exclusive remedy of repair and replacement of defective parts fails of its essential purpose if, after numerous attempts to repair, the car did not operate as a new car should free of defects. White and Summers, supra, § 12-10 at 467. This section of the UCC has been most often *330 relied upon in cases where the exclusive remedy involves replacement or repair of defective parts and the seller, because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in a warranted condition. White and Summers, supra, § 12-10 at 469; Riley v. Ford Motor Co., supra. Under the Magnuson-Moss Act, 15 U.S.C.A. § 2304(a)(4), if the product (or a component part thereof) contains a defect or malfunction, after a reasonable number of attempts to remedy defects or malfunctions of the product, the consumer may elect a refund including reasonable incidental expenses. 15 U.S.C.A. § 2304(d).
Under the UCC when the seller is either unwilling or unable to conform the goods to the contract, the remedy by way of the limited warranty does not suffice. Chatlos Systems v. National Cash Register Corp., 635 F.2d 1081, 1085 (3d Cir.1980), app. after remand, 670 F.2d 1304 (3d Cir.), cert. dism. 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982) (applying New Jersey UCC). In Chatlos, repeated attempts to correct deficiencies in a computer system for a year and-a-half rendered the limited warranty remedy ineffective because it "failed of its essential purpose", N.J.S.A. 12A:2-719(2), and therefore was not enforceable. Id. at 1086. See e.g., Lemaldi v. DeTomaso of America, Inc., 156 N.J. Super. 441 (Law Div. 1978), where plaintiff's "dream car became a nightmare of expense and breakdown" and was in the shop for repair on an average of two times a month for the first one-year warranty. Id. at 447.
In general, the remedies available to a buyer are set forth in N.J.S.A. 12A:2-711. Whether a buyer refuses to accept the product, Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. 441 (Law Div. 1968), or justifiably revokes acceptance, Pavesi v. Ford Motor Company, 155 N.J. Super. 373 (Ch.Div. 1978), disapproved on other grounds, Ramirez v. Autosport, *331 88 N.J. 277 (1982), he has a right to cancel the agreement or seek damages. N.J.S.A. 12A:2-711(1); Ramirez v. Autosport, 88 N.J. at 290. In the present case, if the non-conformity either substantially impaired the value of the Cadillac, N.J.S.A. 12A:2-608, or circumstances caused the limited remedy of repair or replacement of parts to fail of its essential purpose, N.J.S.A. 12A:2-719(2), Jankowitz could sue for a breach of warranty or revoke acceptance of the vehicle. See Ramirez, 88 N.J. at 288-290. In either event, plaintiff's measure of damages for a breach of warranty would have been the difference between the price paid for the Cadillac and its market value in the defective condition. N.J.S.A. 12A:2-711(1), 2-713, 2-714; Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. at 566; Ventura v. Ford Motor Corp., 180 N.J. Super. at 64.
We agree with the trial court that the record is devoid of any proof of damages in the difference between the purchase price and market value of the Cadillac in its defective condition. Nevertheless, whether the remedy is for breach of warranty or revocation of acceptance, Jankowitz may be entitled to recover so much of the purchase price as has been paid. N.J.S.A. 12A:2-608(3); 12A:2-711(1); Ramirez, 88 N.J. at 288-289; 15 U.S.C.A. § 2304(a)(4), which includes the allowance on a trade-in. Ramirez, 88 N.J. at 291. Since an action for breach of an implied or expressed warranty under the UCC is a cause of action under the Magnuson-Moss Warranty Act, 15 U.S.C.A. 2304(e), attorneys fees may be collected for UCC warranty actions in a state court. 15 U.S.C.A. § 2310(d)(1), (2).[2] Thus, the Magnuson-Moss Act has the effect of broadening remedies *332 available under the UCC. Am.Jur, supra, § 48 at 22, citing Fonesca, Handling Consumer Credit Cases, 2d § 27.1.[3]

III
A buyer may revoke acceptance of the goods for nonconformity pursuant to N.J.S.A. 12A:2-608. In order to revoke acceptance, a buyer must show that: (1) the goods do not conform, (2) the nonconformity substantially impairs the value of the goods to the buyer, N.J.S.A. 12A:2-608(1), and that (3) either (a) if the buyer knew of the nonconformity when he accepted the goods, he acted on the reasonable assumption that the same would be cured, but it was not seasonably cured, N.J.S.A. 12A:2-608(1)(a); or (b) if the buyer did not know of the nonconformity when he accepted, his acceptance was reasonably induced either by the difficulty of discovering the nonconformity before acceptance or by the seller's assurances, N.J.S.A. 12A:2-608(1)(b). Moreover, the buyer must revoke within a reasonable time after he discovered the defect or should have discovered it, N.J.S.A. 12A:2-608(2) and before any substantial change occurs in the condition of the goods that was not caused by their own defects. Further, the buyer must notify the seller of the revocation. Ibid.
The UCC has abandoned the use of the term "rescission" in favor of such terms as "cancellation," "termination," or "revocation of acceptance." However, "rescission" and "revocation of acceptance" are generally viewed as amounting to the same thing under the code, Ramirez, 88 N.J. at 288, especially since "cancellation," N.J.S.A. 12A:2-711(1), is a remedy that is available to a buyer who has established justifiable grounds for revocation of acceptance. Ramirez, 88 N.J. at 88-89. Since revocation of acceptance is a statutory remedy, and not an equitable action for rescission, it is an action at law. Sudol v. *333 Rudy Papa Motors, 175 N.J. Super. 238, 240-242 (Cty.D.Ct. 1980). Here, Jankowitz sought, in addition to other relief, rescission of the contract. Nevertheless, since there is no remedy of rescission under the UCC, it will be treated as a revocation of acceptance. Ramirez, 88 N.J. at 288-289; see 67A Am.Jur.2d Sales, § 1194 at 590-591.
Here, GM gave a written express warranty to cover any repairs and needed adjustments to correct defects in materials or workmanship on Jankowitz's Cadillac through his dealer Potamkin for a period of 12 months or 12,000 miles, whichever came first. Potamkin in turn gave an express warranty or service contract, coterminous with the expressed warranty of GM. Despite the fact that the complaint has been dismissed as to GM, Jankowitz has a cause of action for breach of warranty against Potamkin.
Although Jankowitz failed to prove damages by way of the loss of value of the Cadillac under a breach of warranty, he nevertheless, has a cause of action against Potamkin for revocation of acceptance. However, he must demonstrate that the nonconformity substantially impairs the value of the Cadillac and that he has complied with the requirements of N.J.S.A. 12A:2-608 and the Magnuson-Moss Act. Jankowitz, upon compliance with the conditions of that section of the UCC and the Magnuson-Moss Act, not only has the option to revoke acceptance and claim a refund of the purchase price, N.J.S.A. 12A:2-711(1); 15 U.S.C.A. § 2304(a)(4), but also for incidental damages, N.J.S.A. 12A:2-714, 12A:2-715(1); see Ventura v. Ford Motor Co. 180 N.J. Super. at 63.

IV
One ground for revocation of acceptance is that the acceptance of the nonconforming goods was upon a reasonable assumption that the nonconformity would be cured and that it has not been "seasonably" cured, N.J.S.A. 12A:2-608(1)(a), or if acceptance was reasonably induced either by the difficulty of *334 discovery before acceptance or by the seller's assurances. N.J.S.A. 12A:2-608(1)(b). Thus a buyer does not lose the right to revoke acceptances by reliance upon the seller's assurances that the defects will be corrected. When an express warranty obligates the seller to repair defects for a substantial period of time, the buyer may revoke acceptance when the promised repairs are not made, Conte v. Dwan Lincoln-Mercury, Inc., 172 Conn. 112, 120-21, 374 A.2d 144, 149 (1976), or when the seller's attempts to repair prove unsuccessful. Ibid.; 15 U.S.C.A. § 2304(a)(4); Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d 349, 355 (Minn. 1977); Murray v. Holiday Rambler, Inc., 83 Wis.2d 406, 425, 265 N.W.2d 513, 521 (1978). See also 67A Am.Jur.2d, supra, § 1197 at 593-94.
The buyer has the burden to prove that the revocation was proper and justified, including proof that the breach caused a substantial impairment in the value of the contract to the buyer. It is a question of fact as to whether an acceptance has been revoked and whether such nonconformity exists so as to impair the value of the goods to the buyer. 67A Am.Jur.2d, supra, § 1201 at 597-98.[4]

V
The threshold test for revocation of acceptance is whether the defect substantially impairs the value of the goods to the buyer. (emphasis supplied); N.J.S.A. 12A:2-608(1); see Annotation, "What constitutes `substantial impairment' entitling buyer to revoke his acceptance of goods under UCC § 2-608(1)," 98 A.L.R.3d 1183 (1980). Under this code section, while a buyer *335 cannot revoke his acceptance for trivial defects that are easily corrected, Herbstman v. Eastman Kodak Co., 68 N.J. at 9, a succession of minor defects combined with a major defect may amount to a substantial impairment. For example, see Durfee v. Rod Baxter Imports, Inc., 262 N.W.2d at 354, (rattle under dashboard of car, continuous activation of seat belt warning system, engine temperature indicating "hot," and malfunctioning of heating unit, combined with major defect of frequent stalling of engine).
Courts have differed as to whether a substantial impairment is to be determined by a subjective or objective standard. 67A Am.Jur.2d, Sales, § 1203 at 600. Although N.J.S.A. 12A:2-608 of the UCC relates the impairment of value "to him" [the buyer], New Jersey has held that "a substantial impairment is based upon an objective factual evaluation rather than upon a subjective test of whether the buyer believed the value was substantially impaired." Herbstman v. Eastman Kodak Co., 68 N.J. at 9. However, it has been suggested that
the sounder view is that a personalized but objective determination must be made, personalized in the sense that the facts must be examined from the viewpoint of the buyer and his circumstances, objective in the sense that the criterion is what a reasonable person in the buyer's position would have believed. In other words, the statute creates a subjective test in the sense that the requirements of the particular buyer must be examined and deferred to; however, since the rationale of the "substantial-impairment" requirement is to bar revocation for trivial defects or defects that can easily be corrected, the impairment of the buyer's requirements must be substantial in objective terms. It is sufficient if the buyer shows that the product would not function or would not function well enough to accomplish the buyer's purpose. [67A Am.Jur.2d, § 1203 at 600, footnotes omitted].
See cases cited in Annotation, supra, 98 A.L.R.3d § 3[a] at 1191. The degree of impairment is not necessarily measured by the dollar cost of curing a nonconformity in the goods, Annotation, supra, 98 A.L.R.3d, § 3[b] at 1193 and cases cited.
In Herbstman, the Supreme Court noted that plaintiff had "failed to establish a substantial impairment of the value of the camera. There [was] an utter absence of proof that [the defect *336 or nonconformity] involved a minor or major repair, the cost of repair, and the effect of that defect on the value of the camera." 68 N.J. at 9. However, Herbstman was for a breach of implied warranties, id. at 8 and plaintiff was "not relying upon any express representation or warranty made by Kodak [manufacturer]", id. at 11. Also, in Herbstman, the plaintiff-purchaser never permitted the defendant-manufacturer to attempt to repair the defect alleged, therefore there was nothing in the record to prove the nature and extent of the defect, i.e., whether it was trivial which may have been easily corrected. 68 N.J. at 9.

VI
In reviewing the evidence on the motions for dismissal, the trial court, among other things, found that Jankowitz had failed to produce an expert to prove that there was a defect which substantially impaired the value of the car:
I think you need an expert in order to prove under the code that there was a defect that substantially impaired the value of the vehicle.
Not only don't we have an expert that would show that or testify to that, but the only proves [sic] are that a year later there was wholesale price paid at an auction, which was fairly close, consistent with the original purchase price, and the testimony is that no other repairs were done from the time that it was taken or repossessed, and we have no testimony, in any event, with respect to what the impairment of the value would be. So there is nothing left to proceed with in this case.
We disagree. In the first place, in a breach of warranty action, plaintiff need not establish the existence of a defect; the failure of the Cadillac to perform as warranted is sufficient. Spring Motors Distributors, Inc. v. Ford Motor Co., supra, 98 N.J. at 586; Realmuto v. Straub Motors, 65 N.J. 336, 343 (1974). Moreover, the testimony that "no other repairs were done from the time that it was taken or repossessed" is a factual matter to be determined by the jury, not the court. Jankowitz had previously testified that on June 23, 1982 the Cadillac malfunctioned as it had on approximately six previous occasions. Potamkin did not pick up the Cadillac until a year later with 3,213 miles as opposed to 2,700 as testified to by Jankowitz. The record is void *337 of any information concerning the use or whereabouts of the automobile during the following year nor is there any explanation as to the difference in mileage. Moreover, although Knast, the special collection manager for GMAC, testified that they never received any compliants about the condition of the car from the party who purchased it at the auction, the car was sold to a wholesale dealer who may very well have remedied any defects.
Here, as in Ventura v. Ford Motor Corp., 180 N.J. Super. at 53, "[w]e reject the contention that, lacking expert proof, plaintiff failed to establish [the defect].... This conclusion could be reached by inferences from the evidence." "In our view, the total effect of the circumstances shown from the purchase [to the revocation of acceptance] is adequate to raise an inference that the car was defective." Henningsen v. Bloomfield Motors, Inc., 32 N.J. at 409. As observed in Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. at 454:
The dealer with his staff of expert mechanics and modern equipment knows or should know of substantial defects in a new automobile which it sells.
Here, Potamkin, from the numerous attempts to repair the defect in the Cadillac, was aware or should have been aware that it did not conform to the bargain between the parties. Id. at 455. 15 U.S.C.A. § 2304(a)(4) (If a product contains a defect or malfunction after a reasonable number of attempts to remedy the defects or malfunctions, the warrantor must permit the consumer to elect a refund or replacement). Cf. N.J.S.A. 56:12-22(a), footnote 4, supra, which establishes a presumption of four attempts to conform the automobile to the warranty as a reasonable number.
In the present case the precise reason why Jankowitz returned the Cadillac to Potamkin on numerous occasions was to correct defects; Potamkin is the expert and from the work orders there is no question but that there was a defect and from the testimony of Jankowitz the defect was never cured. In view of the history of the constant return of the Cadillac to Potamkin and the acknowledgement by Potamkin through its work orders that there was a defect and, after several attempts *338 to repair, there still was a defect in the electronic system, according to Jankowitz, he was not required to prove a defect. Rather, it was up to the expert, Potamkin, to prove that the defect was corrected. Potamkin's own records indicate that the Cadillac was returned for the same defect or malfunction on at least six occasions. The testimony by Knast that Potamkin made no repairs after the vehicle was repossessed and that there were no complaints concerning the condition of the Cadillac from the purchaser-dealer are factual questions which may or may not rebut the presumption.
As to the damage aspect, even though Jankowitz failed to prove the difference in the price paid by him and the market value of the Cadillac, N.J.S.A. 12A:2-713(1); Ventura, 180 N.J. Super. at 64 he also sought "rescission" under which he was entitled to recover the amount of the purchase price which had been paid. N.J.S.A. 12A:2-711; Ramirez, 88 N.J. at 291. The purchase price, including the trade-in allowance, ibid., plus payments on account and any incidental expenses incurred, N.J.S.A. 12A:2-713(1), 12A:2-715(1); 15 U.S.C.A. at § 2304(d), as circumscribed by N.J.S.A. 12A:2-715(1), may be claimed by plaintiff.[5] Therefore, no expert was required to prove damages for the return of the purchase price and payments plus incidental expenses.

VII
Another intangible factor to determine whether a "nonconformity substantially impairs [the value of the goods to the buyer]," N.J.S.A. 12A:2-608(1), (emphasis supplied), is whether the nonconformity is such that it "shakes the buyer's confidence" in the goods. As stated in Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. at 458:
For a majority of people the purchase of a new car is a major investment, rationalized by the peace of mind that flows from its dependability and safety. Once their faith is shaken, the vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is substantially impaired and whose *339 operation is fraught with apprehension. The attempted cure in the present case was ineffective.
For a decision supporting the view that the value is substantially impaired where nonconformity causes a loss of the buyer's confidence in the goods see Testo v. Russ Dunmire Oldsmobile, Inc., 16 Wash. App. 39, 47-49, 554 P.2d 349, 356 (1976); see also Annotation, supra, 98 A.L.R.3d at 1194. An unreasonable length of time to repair defects may also have the effect of impairing usefulness of the product for a substantial length of time; defects which might otherwise be deemed minor may thus have a substantial impact upon the buyer. E.g. Jorgensen v. Pressnall, 274 Or. 285, 270, 291, 545 P.2d 1382, 1385 (1976), where one of the factors upon which the court based its conclusion that there had been a substantial impairment in the value of a mobile home was the failure of the seller to repair the defects, which were relatively inexpensive, in a timely manner. This failure, the court held, caused the purchaser to be deprived of the benefits and comforts of the mobile home for a substantial period of time.
Normally, it is a question of fact whether the seller's breach substantially impaired the value of the contract to the buyer. 67A Am.Jur.2d, Sales, § 1206 at 603.

VIII
The UCC does not provide for the seller's right to an offset for the buyer's use of the goods before rejection or revocation. White and Summers, supra, § 8-3 at 317. On the other hand the Magnuson-Moss Act specifically provides in defining the term "refund" to mean the actual purchase price less reasonable depreciation based on actual use where permitted by the Rules of the Commission. 15 U.S.C.A. at § 2301(12). Nevertheless, under the UCC it has been recognized that in some instances the seller is entitled to a credit for the value of the use prior to revocation. Fablok Mills, Inc. v. Cocker Machine & Foundry Co., 125 N.J. Super. 251 (App.Div. 1973), certif. den. 64 N.J. 317 (1973); Ventura v. Ford Motor Corp., *340 180 N.J. Super. at 63; Pavesi v. Ford Motor Co., 155 N.J. Super. at 379-380. But where the product is defective and fails to perform the function for which it was purchased and, if it confers a benefit at all, it is a lesser benefit than the buyer expected to receive, this factor may be considered in determining the "value" received by the buyer during his use prior to the revocation. White and Summers, supra, § 8-3 at 318. See also American Container Corp. v. Hanley Trucking Corp., 111 N.J. Super. 322 (Ch.Div. 1970) (buyer justified in rescinding contract for purchase of a truck on the ground that it was stolen merchandise even after using it for 16 months where it had operated satisfactorily, but seller was entitled to reasonable value for use of the truck).
The order dismissing the complaint is reversed and the matter is remanded to the trial court for proceedings consistent with this opinion.
NOTES
[1] Under the Magnuson-Moss Warranty Act, if, under state law, the supplier is deemed to have "adopted" the written affirmation of fact, promise, or undertaking, the supplier is also obligated under the Act. Am.Jur. (New Topic Service), Consumer Product Warranty Acts, § 33, citing 16 CFR § 700.4; cf., Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 582 (1985) (suppliers warranties made to a manufacturer extended to purchaser).
[2] The "lemon law", which permits an allowance for attorney fees, N.J.S.A. 56:12-19 et seq., did not become effective until June 20, 1983, after the dates of sale herein, and applies only to manufacturers' express warranties.
[3] The foregoing discussion of warranties, breach of warranties and measure of damages under the UCC is taken essentially from D'Ercole v. Fruehauf, 206 N.J. Super. 11 (App.Div. 1985).
[4] Under the "lemon law" it is presumed that a reasonable number of attempts have been undertaken to conform a new automobile to the manufacturer's express warranty if, within the warranty term or during a period of one year of the date of delivery of the motor vehicle, whichever is earlier, the same non-conformity has been subject to repair or correction four or more times by the manufacturer, its agents or dealers and the non-conformity continues to exist. N.J.S.A. 56:12-22a.
[5] Under N.J.S.A. 56:12-21b the purchaser is entitled to a refund of not only the full purchase price of the original automobile but also "all taxes, preparation fees and any other charges or fees paid by the consumer".