703 A.2d 288

MERCEDES–BENZ CREDIT CORPORATION, PLAINTIFF–RE-SPONDENT, v. CHRISTOPHER LOTITO, DEFENDANT/THIRD–PARTY PLAINTIFF–APPELLANT, v. RAY CATENA MOTOR CAR CORP., MERCEDES–BENZ CREDIT CORP. MERCEDES–BENZ NORTH AMERICA, INC., AND MERCEDES–BENZ, A.G., THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 5, 1997—Decided December 5, 1997.

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*S.M. Chris Franzblau* argued the cause for appellant (*Franzblau Dratch, P.C.*, attorneys; *Mr. Franzblau*, of counsel; *Milton M. Breitman*, on the brief).

*Kathleen Cavanaugh* argued the cause for respondent (*Baron, Gallagher & Perzley*, attorneys; *Jerome F. Gallagher, Jr.* and *Mitchell E. Grodman*, on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

This issue presented for decision in this case is whether a leasing company which is closely affiliated with an automobile manufacturer, a distributor and a dealer, yet still a separate entity, is subject to a customer's defense of breach of warranty. The specific question here is whether the leasing company may enforce a vehicle lease over a defense that the vehicle suffers from manufacturing defects in breach of the new car warranty. We hold that enforcement must await determination of the breach of warranty issues.

Defendant selected a luxury car offered for sale by Ray Catena Motor Car Corp. (Catena) and chose to lease the vehicle. Using a form of lease provided by plaintiff, Mercedes–Benz Credit Corporation (MBCC), Catena as lessor and defendant as lessee executed a lease on July 10, 1993, for a new Mercedes Benz model 500SL, at the monthly rate of $1,419 for forty-eight months. The total monthly payments would be $68,112 with a stated residual value of $53,585. The lease provided for simultaneous assignment by Catena to MBCC, "pursuant to the terms of the Dealer Automobile Purchase and Lease Assignment by and between Lessor and [MBCC]," and the certificate of title was issued to MBCC.

The terms of the lease purported to insulate MBCC from liability for breach of any warranty or any claim by defendant with respect to the car. The pertinent parts of the relevant paragraphs state:

6. VEHICLE WARRANTIES AND DISCLAIMERS.

To the extent they are assignable, you [lessor] agree to assign to me [defendant] all your rights and remedies under the manufacturer's standard written warranties applicable to the vehicle. I acknowledge that you make no express warranties regarding the vehicle as to its condition, merchantability, or fitness for use, that you disclaim any implied warranties and that I am leasing it from you "as is".

19. ABATEMENT

The monthly rent shall be paid for the full term of the lease ... without setoff, counterclaim, reduction, abatement, suspension, deferment, or any other defense because of ... unsatisfactory performance of the vehicle or for any other reason whatever including, but not limited to, mechanical or warranty problems....

Paragraph nineteen also provided that defendant agreed to use the manufacturer's dispute resolution system before taking any action against MBCC if there was a dispute regarding the manufacturer's warranty.

When defendant leased the car, he received warranties on the vehicle from both the manufacturer and the dealer. The warranty from the manufacturer provided that Mercedes–Benz of North America (MBNA) would "make any repairs or replacements necessary, to correct defects in material or workmanship." Catena, as the authorized Mercedes dealer, was a "co-warrantor." Both the express warranties and any warranties implied by law were to last for either forty-eight months or 50,000 miles, whichever came first.

Defendant paid the monthly rent on the lease for twenty-five months, but he was continually dissatisfied with the car's performance. He experienced repeated problems with it and frequently returned to Catena for repairs during that period of time. Aside from scheduled maintenance, forty-eight days were used to perform $22,269 of warranty work at Catena. Defendant admits he never informed MBCC of problems with the car, but rather, dealt with personnel at the Catena dealership, because it was his belief that the two entities were the same.

Frustrated at the fact that the car repeatedly manifested problems and could not seem to be repaired properly, defendant stopped paying on the lease in July 1995. In November 1995, MBCC filed an action against defendant in the Law Division, alleging that defendant was in default of payments due on the lease. It therefore requested a writ of replevin ordering defendant to turn over the vehicle, as well as damages for monies due and unpaid under the lease. Defendant filed an answer with separate defenses and a counterclaim against MBCC; one of the separate defenses asserted that MBCC breached the applicable warranties "in conspiracy with the third-party defendants" and thereby breached the lease. Also included was a third-party action against MBCC, Catena, MBNA, and Mercedes–Benz A.G.

(MBAG), a German company that manufactured the automobile in question. MBNA, MBCC and MBAG are each subsidiaries of Daimler--Benz A.G., a German corporation.

Defendant surrendered the car in January 1996, and MBCC eventually sold it at auction. When the final credits and charges were totaled, MBCC claimed defendant owed it $34,443.13 including attorneys' fees and costs of $5,506.06.[1] MBCC was granted summary judgment in that amount and defendant's counterclaim was dismissed with prejudice. The order granting that relief was certified as a final judgment, pursuant to R. 4:42–2, leaving the third-party action to be prosecuted.

The motion judge found that using MBCC as a leasing company "was a convenience, but there's nothing here to suggest anything other than a separate entity. Obviously [the third-party defendants] worked together because—it becomes a very convenient arrangement. But that does not destroy the separateness of [MBCC] in the context of the role it played in this lease arrangement." The judge did not otherwise attempt to analyze the relationships among the third-party defendants or explain why MBCC was clothed with "separateness," despite the unrefuted allegations of the many indicia of a working relationship involving MBNA, MBCC and Catena.

On appeal, defendant contends summary judgment was erroneously granted because: (1) the disclaimer and waiver provisions of the lease were unenforceable and he is entitled to relief under the "lemon law," N.J.S.A. 56:12–29 to –49, and (2) because the car was so defective, there was a breach of express and implied warranties. Regardless of the legal analyses expressed by the parties, we believe the starting point must be Unico v. Owen, 50 N.J. 101, 232 A.2d 405 (1967).

In Unico, a consumer responded to an advertisement to purchase 140 record albums and a stereo from Universal Stereo

---

[1] The figures were not contested.

Corporation. The purchase price was financed through a retail installment contract and note providing for a down payment and thirty-six monthly payments. Universal was to deliver the records over a six-year period. Universal and the buyer entered into an installment contract, which consisted of "11 fine print paragraphs." [2] The contract was directly assigned to a lender, Unico, as patently contemplated. The "reasonable and normal expectation" of the buyer was that "performance of the delivery obligation was a condition precedent to his undertaking to make installment payments." *Id.* at 106, 232 *A.*2d 405. However, there was a clause stating that if the contract was assigned, the buyer's liability to the assignee would be "immediate and absolute and not affected by any default whatsoever of the Seller signing this contract." The buyer also agreed not to set up any defense viable against the seller if sued by the note's assignee for nonpayment. *Ibid.*

Unico was a "partnership formed expressly for the purpose of financing Universal Stereo Corporation" which had "a substantial degree of control of [the] entire business" of Universal. *Id.* at 114, 232 *A.*2d 405. Specifically, Unico set forth the credit qualifications of buyers, the requirements for making the notes and the endorsements, and the maximum length of term for the consumer contracts involved. *Id.* at 114–15, 232 *A.*2d 405. The Court summarized this control as one in which Unico "had a thorough knowledge of the nature and method of operation of Universal's business [and] also exercised control over it." *Id.* at 115, 232 *A.*2d 405. "To say the relationship between Unico and the business operations of Universal was close, and that Unico was involved therein, is to put it mildly." *Id.* at 115–16, 232 *A.*2d 405.

The buyer received the stereo and the first delivery of twelve albums and he paid the next succeeding twelve monthly installments, but he never received another record album. When Unico

---

[2] The Court's opinion makes no mention of a disclaimer of warranty clause in the contract.

sought payment several months later, the buyer advised that payments would be resumed if the albums were delivered. None were delivered because Universal was insolvent, and Unico sued for the balance due on the note plus attorneys fees. The trial court found Unico was not a holder in due course of the note and Universal's breach of the contract barred recovery.

On appeal, our Supreme Court noted the disparity of more than two years between the payment obligation and the delivery obligation. Calling this "hyper-executory," the Court expressed concern over this disparity in rights between buyer and seller or transferee. Together with the provisions governing the defenses against the assignee, the Court described the arrangement as "designed to put the buyer-consumer in an unfair and burdensome legal strait jacket" from which there was no "escape no matter what the default of the seller, while permitting the note-holder, contract-assignee to force payment from [the buyer] while enveloping itself in the formal status of holder in due course." *Id.* at 115, 232 *A.*2d 405.

The Supreme Court upheld the buyer's right to defend against the suit for payment on the note based on the seller's alleged default. Holder in due course status was neither necessary nor desirable when the transferee knew a great deal about, or controlled or participated in, the underlying transaction. *Id.* at 109–110, 232 *A.*2d 405. Consistent with other decisions protecting the consumer in transactions involving a consumer and a commercial entity, such as *Henningsen v. Bloomfield Motors,* 32 *N.J.* 358, 161 *A.*2d 69 (1960), the Court explained that courts should give special scrutiny to such contracts to ensure that they were consistent with "principles of equity and public policy." *Unico, supra,* 50 *N.J.* at 112, 232 *A.*2d 405. Underlying these decisions was the inequality in bargaining power between the typical consumer and lender; the lender had not only more economic and bargaining power, but greater expertise, along with the ability to write adhesion contracts that unduly favored the lender. *Id.* at 110, 232 *A.*2d 405.

Accordingly, the Court declared that in "consumer good sales cases," holder in due course status would be denied to finance companies whose "involvement with the seller's business is ... close, and whose knowledge of ... the terms of the underlying sale agreement is ... pervasive." *Id.* at 116, 232 *A.*2d 405.[3] The Court relied on decisions from other states which also denied holder in due course status in cases involving not only individual buyers, but commercial ones as well. *See Commercial Credit Corp. v. Orange County Mach. Wks.*, 34 *Cal.*2d 766, 214 *P.*2d 819 (1950); *Local Acceptance Co. v. Kinkade*, 361 *S.W.*2d 830 (Mo. 1962); *International Finance Corp. v. Rieger*, 272 *Minn.* 192, 137 *N.W.*2d 172 (1965); *Mutual Finance Co. v. Martin*, 63 *So.*2d 649 (Fla.1953).

The Court explained its holding succinctly:

> For purposes of consumer goods transactions, we hold that where the seller's performance is executory in character and when it appears from the totality of the arrangements between dealer and financer that the financer has had a substantial voice in setting standards for the underlying transaction, or has approved the standards established by the dealer, and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards, the financer should be considered a participant in the original transaction and therefore not entitled to holder in due course status.
>
> [*Id.* at 122–23, 232 *A.*2d 405.]

The Court, however, reserved decision on the very issue presented in this case: "whether, when the buyer's claim is breach of warranty as distinguished from failure of consideration, the seller's default as to the former may be raised as defenses against the financer." *Id.* at 123, 232 *A.*2d 405. The Court also struck as unconscionable the clause in which the buyer promised that in the event the lender sued, the buyer would waive any defenses

---

[3] The protection was extended to the plaintiff not in his capacity as "buyer" but rather as "consumer." Thus, the policy of consumer protection supporting this holding applies equally to buyers as well as lessees. *See A–Leet Leasing Corp. v. Kingshead Corp.*, 150 *N.J.Super.* 384, 392, 375 *A.*2d 1208 (App.Div.) (" 'in this day of expanding rental and leasing enterprises,' the consumer who leases a product should be given protection equivalent to the consumer who purchases."), *certif. denied*, 75 *N.J.* 528, 384 *A.*2d 508 (1977).

otherwise good against the seller. *Id.* at 123–25, 232 *A.*2d 405. The legalistic waiver provision, buried in a small-print contract, was "fraught with opportunities for misuse" and therefore would be stricken as unconscionable. *Id.* at 125, 232 *A.*2d 405. Citing *N.J.S.A.* 12A:2–302 and 12A:9–206, the Court observed "in the enactment of these two sections of the Code an intention to leave in the hands of the courts the continued application of common law principles in deciding in consumer goods cases whether such waiver clauses as the one imposed on Owen in this case are so one-sided as to be contrary to public policy." *Ibid.* We now take the next step and hold that a consumer lessee may raise a breach of warranty against the lessor when there is a sufficiently close relationship between the seller, the manufacturer and the lessor, and that an attempt to disclaim such obligations by contract is unenforceable.

In *Unico* and here, there is a tripartite contract involving a consumer, a buyer, and a financer. The difference, however, is that *Unico* involved a *loan* with an affiliated company, while this case involves a *lease* with an affiliated company. However, that makes no difference. These two types of arrangements are truly similar, especially from the individual consumer's perspective. In each case, a financing company supplies capital to an individual buyer in order to acquire a product, here an automobile.

As in *Unico,* the relationship between the lessor (MBCC) and the dealer (Catena) and the manufacturer (MBNA and Daimler–Benz) is very close. MBCC created the lease form and authorized personnel at dealerships to execute the leases essentially on its behalf. Although MBCC was not literally dominating the sales component of Mercedes–Benz's business, the fact remains that MBCC had a close involvement with Catena and MBCC's knowledge of "the terms of the underlying sale agreement" was extensive. *Unico,* 50 *N.J.* at 116, 232 *A.*2d 405. Thus, there is sufficient closeness between the financer and the seller here to justify treating this case similarly to *Unico.*

The disparity in bargaining power evident in *Unico*, which cannot be denied as a reason for the decision, is also sufficiently similar in this case. Decisions like *Unico* are plainly based, in part, on economic disparity or knowledge disparity between buyer and seller/lender. And, although the buyer here was able to afford a luxury car with high monthly payments and was a successful businessman, more able than most consumers to evaluate lease and finance options, he is still an individual consumer subject to the pressures attendant to an adhesion contract.

In addition, study of Article 2A of the Uniform Commercial Code is required as a source of public policy because it will govern all leasing transactions after January 10, 1995. *L.* 1994, *c.* 114, § 12. Although not applicable to this transaction which was made a year before the legislation was enacted, the Code imposes on certain lessors both implied and express warranties with respect to the goods. *See N.J.S.A.* 12A:2A–212, –213. Nothing in the adoption of Article 2A, as a source of public policy governing lease law, bars extending the rule of *Unico* (dealing with failure of consideration as a defense to a loan contract) to this case (dealing with breach of warranty as a defense to a lease contract). To the contrary, the comments to Article 2A make it clear that the courts will determine, case-by-case, whether finance lessors that are "affiliate[s] of the supplier of goods" should answer for a seller's warranty. *Official Comment to U.C.C. § 2A–101, "Finance Leases"; Official Comment to U.C.C. § 2A–103(h).*

Expanding the defenses which may be asserted against a lessor in a consumer goods transaction involving close ties between seller, manufacturer and lessor requires a balancing of the rights of the consumer and these entities. A major consideration of *Unico* is protection of consumer expectations and rights, such as the notion that if a consumer buys a product and that product is defective, the consumer does not have to pay for it unless its warranties were validly disclaimed; rather, it will be repaired or the purchase price will be returned. This is a sound and reasonable expectation to protect. Thus, if a consumer bought a new car

and received warranties on it, absent unusual circumstances it would be expected that the seller will answer for any defects and fix them. Similarly, where a truly independent lender finances a consumer's acquisition of a car, it is ordinarily expected that the lender will not be responsible if the car is a "lemon." But the financing agency here is not truly independent, and is instead an affiliated company with relations so close to the actual seller that they are equivalent to the relationship the court scrutinized in *Unico*.

Of course in *Unico*, the seller was insolvent and the consumer could only look to the lender as a source of recovery. Here, plaintiff's reasonable expectations as a consumer can be satisfied by Catena or MBNA if the warranties were breached. Other jurisdictions have subjected an affiliated financer to warranty liability when the seller cannot answer for a breach of warranty. *See U.S. Roofing v. Credit Alliance Corp.*, 228 *Cal.App.*3d 1431, 279 *Cal.Rptr.* 533 (1991) (a lessor may disclaim warranties in equipment selected solely by the lessee provided that the lessee "has an adequate remedy against the manufacturer or supplier for any defect in the equipment.")

■ We hold, however, that the financial stability of the expected warrantor is not the qualifier to assertion of a breach of warranty as a defense to a suit for breach of the lease or the loan on which the original sale was based. Here, the trial judge entered judgment in MBCC's favor without exploring whether there had been a breach of warranty in this case. In other words, the third-party claims against Catena, MBNA and MBAG were left unresolved. Implicitly, the trial judge also dismissed defendant's second defense to the suit against him, that MBCC breached the applicable warranties "in conspiracy with the third-party defendants" and thereby breached the lease.

We think this was incorrect. Thus, if defendant proves the car to be defective and that he was damaged thereby, the case becomes a question of which component in the chain of distribution of Mercedes–Benz products will bear the loss caused by a

manufacturing defect: the manufacturer, its financing company, or its franchisee. Of course, that loss could be more than, less than or the same as the damages proved by MBCC for defendant's failure to maintain the lease.

From this, it follows that the judge erred in granting judgment in MBCC's favor without determining whether there was a breach of warranty in this case. Thus, the order of the trial judge is proper if deemed a partial summary judgment in MBCC's favor, subject to the outcome of defendant's proofs on his second separate defense against MBCC, that is, the breach of warranty claims. We so modify the ruling. This disposition of the MBCC-defendant claim also allows for a more orderly apportionment of credits and debits between the parties and provides for satisfaction by each party of its particular responsibilities. *See Freeman v. Hubco Leasing, Inc.*, 253 *Ga.* 698, 324 *S.E.*2d 462 (1985)(where lessor and dealer were brother-sister corporations, lessor's money damages under the lease can be setoff against dealer's liability for damages attendant on revocation of acceptance and lessor is estopped from separate execution on its judgment).

Therefore, if defendant fails to show the car is defective, MBCC will have an award against defendant. On the other hand, if defendant succeeds in showing the car is defective, his liability to MBCC may be erased or reduced. In addition, MBCC or defendant or both may have awards against the third-party defendants. We express no view on these issues, but hold instead that the trial court acted precipitously in granting summary judgment resolving the MBCC-defendant claims, defenses, and counterclaims at this point in the litigation.

This disposition recognizes the disparity in economic power between a consumer like defendant and companies like the third-party defendants. The latter are clearly more able than an individual consumer to "absorb the impact of a single imprudent or unfair exchange." *Unico, supra,* 50 *N.J.* at 110, 232 *A.*2d 405. Again, although MBCC's damages are uncontested, the trial court should hear from defendant on his breach of warranty claims. It

should also hear the other parties' evidence on the breach of warranty issues and only then enter final judgment. Rather than allowing these affiliated companies to inequitably squeeze plaintiff, MBCC will not be permitted to collect sums due from him until the third-party claims are resolved and the breach of warranty issues decided. *Freeman, supra,* 324 *S.E.*2d at 469; *see also Hallowell v. American Honda Motor Co., Inc.,* 297 *N.J.Super.* 314, 688 *A.*2d 110 (App.Div.1997). Such a disposition also promotes judicial economy by preventing piecemeal appellate review of a single case.

The designation of the order granting summary judgment to MBCC as a final judgment is reversed. The order is deemed to be one of partial summary judgment and the matter is remanded to the Law Division for reconsideration of factual proofs on defendant's breach of warranty claims and entry of a final judgment. We do not retain jurisdiction.