746 A.2d 480 (2000)
MERCEDES-BENZ CREDIT CORPORATION, Plaintiff-Respondent/Cross-Appellant,
v.
Christopher LOTITO, Defendant/Third Party Plaintiff-Appellant/Cross-Respondent,
v.
Ray Catena Motor Car Corporation, and Mercedes-Benz North America, Inc., Third-Party Defendants-Respondents/Cross-Appellants, and
Mercedes-Benz, A.G., Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 2000.
Decided February 28, 2000.
*482 S.M. Chris Franzblau, Livingston, for defendant/third party plaintiff-appellant/cross-respondent (Franzblau Dratch, attorneys; Mr. Franzblau and Milton M. Breitman, on the brief).
Jerome F. Gallagher, Jr., Parsippany, for plaintiff-respondent/cross-appellant (Gallagher, Cavanaugh & Perzley, attorneys; Mr. Gallagher and Mitchell E. Grodman, on the brief).
Thomas D. Shea, Jr., Morristown, for third-party defendants-respondents/cross-appellants (Graham, Curtin & Sheridan, attorneys; Mr. Shea and Christopher Viceconte, on the brief).
Before Judges PETRELLA, BRAITHWAITE and COBURN.
*481 The opinion of the court was delivered by COBURN, J.A.D.
Plaintiff, Mercedes-Benz Credit Corporation ("MBCC") filed this action in the Law Division, alleging that defendant Christopher Lotito was in default of payments due on a four-year lease for a new automobile. Lotito filed a counterclaim and a third-party complaint against defendants Ray Catena Motor Car Corp. ("Catena") and Mercedes-Benz North America, Inc. ("MBNA"), for breach of express and implied warranties under the Uniform Commercial Code and for violation of the Lemon Law, N.J.S.A. 56:12-29 to -49.
MBCC obtained an order for summary judgment against Lotito for $34,443.13, representing the net amount due under the lease, and Lotito's counterclaim was dismissed with prejudice. The judge designated the order as a final judgment. Lotito appealed, and we reversed, holding that enforcement of the lease obligations must await determination of the breach of warranty issues and the Lemon Law claim. Mercedes-Benz Credit Corp. v. Lotito, 306 N.J.Super. 25, 35, 703 A.2d 288 (App.Div.1997). We noted that although Lotito did not contest the accuracy of MBCC's claim, he was entitled to an opportunity to prove the claims set forth in his counterclaim and third-party complaint. Id. at 36, 703 A.2d 288. Therefore, we reversed the designation of the order granting summary judgment as a final judgment, deemed it to be one of partial summary judgment, and remanded for trial of Lotito's affirmative claims. Id. at 37, 703 A.2d 288. On the eve of trial, without having filed a notice of motion, Lotito asked for permission to amend his complaint to add a cause of *483 action under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -48. The request was denied as untimely.
The breach of warranty claims were tried to a jury. In answer to written interrogatories, the jury returned inconsistent, special verdicts about which all parties complain; however, the judge interpreted the verdicts as warranting entry of a judgment relieving Lotito of any obligation under the lease (thereby vacating the $34,443.13 partial summary judgment award to MBCC) and awarding him an $8,000 recovery against MBCC for breach of implied warranty.
The jury was also requested to return advisory verdicts on certain aspects of Lotito's Lemon Law claim. We refer to the advisory verdicts only because the parties have argued as if those verdicts could be considered as a basis for judgment. But that is not so generally, and it is certainly not so in the circumstances of this case.
R. 4:35-2 governs the use of advisory juries. It provides that "[t]he court on motion or its own initiative may try with an advisory jury any issue not triable of right by a jury, or it may, with the consent of all parties appearing at the trial, order a trial of any such issue with a jury whose verdict has the same effect as if trial by jury had been a matter of right."
Our rule accords with the generally accepted principle that absent extraordinary circumstances, elevation of an advisory verdict to a binding verdict violates procedural due process. Almog v. Israel Travel Advisory Serv., Inc., 298 N.J.Super. 145, 159-60, 689 A.2d 158 (App.Div. 1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998). Due process is implicated mainly because "it is recognized that advisory juries ordinarily consider fewer than all the issues and that even where they consider all the issues, trial strategy is, to a significant extent, dependent upon who the ultimate fact finder will be." Id. at 159, 689 A.2d 158. Almog is an example of the kind of extraordinary circumstances that warrant acceptance of an advisory verdict as a binding verdict. There, the parties tried the entire case to the jury, which was fully charged. It was only after the jury had the case that the court decided on motion that it would treat the verdict on a certain claim as advisory. Since the "jury never functioned as or was constituted or denominated as an advisory jury," we held "there is no prejudice ... in accepting the jury's fact-finding as the final verdict." Id. at 160, 689 A.2d 158.
Here, the judge decided without motion to ask the jury for advice on the Lemon Law claim. The parties did not agree that the jury's answers would be binding. Moreover, the judge clearly explained to the jury that "[i]t will be my function to decide the Lemon law questions and not yours." He also explained that he would generally describe the law on this subject only to the extent he believed necessary for them to answer certain factual questions. And, he did not discuss the remedies available under the Lemon Law, other than to assure that if he granted damages, there would be no double recovery. Therefore, under the rule itself and the principles endorsed by Almog, supra, the advisory verdicts were of no legal effect.
After the jury trial ended, the judge decided the Lemon Law claim against Lotito based on his own findings of fact and conclusions of law.
Lotito appealed and the others filed cross-appeals. We affirm the judgment rejecting the Lemon Law claim because it is based on findings of fact that are adequately supported by the evidence and is legally sound; however, because of errors in the charge and inconsistencies in the special verdicts, we reverse and remand for a new trial on the breach of implied warranty claim, reinstating for the time being the partial summary judgment awarded to MBCC.

*484 I

On June 10, 1993, Lotito leased a new Mercedes-Benz 500SL automobile from Catena, which simultaneously assigned the lease to MBCC. Lotito received a trade-in credit of $13,603.44, paid an additional $2,058.90 (which covered the first month's rent, an acquisition fee, and license and registration fees), and agreed to pay $1,419 per month for four years. By the end of the lease, had no problems arisen, he would have expended approximately $68,000 and would have been entitled to purchase the vehicle for approximately $54,000. The manufacturer's suggested list price was $102,495, and all agree that this was a luxury car. Lotito signed the lease on July 10, 1993.
On July 16, Lotito brought the car back to Catena with complaints about the operation of the convertible top, the alignment of doors, the tendency of the engine to idle fast, inoperability of the telephone, static on the radio, and a "dent chip" on the trunk. Catena addressed some of the problems, but could not confirm any defects with respect to the phone, radio, or idling. Lotito picked up the car twelve days later.
On August 5, Lotito brought the car in and Catena replaced the cable and motor for the antenna. The car was returned after five days.
On October 4, Lotito returned with the car, complaining of roof leaks and, for the second time, of high engine idle, which he described as the engine racing and surging. The roof was repaired but Catena found the engine to be operating normally. This was the date of the regular 1000-mile maintenance service, and the car was in the shop for one day.
On November 12, the car stalled and could not be started. It was towed to Catena where, over a seven-day period, the ignition control unit, the "EZL" box, and the spark plugs were replaced and the engine mounts were repaired.
On April 4, 1994, Lotito brought the car in for the regular maintenance service, complaining that there was "hesitation" during acceleration at highway speeds, the roof was leaking again, and there was a "rotten egg smell." He testified that there was always a problem with this smell in the car, although there is no evidence that he complained about it during the first nine months.
The servicing took one day. A catalytic converter was ordered, apparently for later installation in Lotito's car.
On May 3, Lotito complained again about roof leaks and the rotten egg smell. The leaks were repaired and the new catalytic converter was installed to rectify the rotten egg smell. The car spent two days in the shop.
On June 27, Lotito brought the car in for a regular servicing, and complained of continued roof leaks and engine surging while idling. Catena found no problem with the engine but installed new seals to deal with the leaks. The car was returned to Lotito after three days.
On July 10, the leaky roof problem was repaired satisfactorily.
On August 4, Lotito wrote to the customer service office of MBNA asking for help but not stating that he wanted to return the car. The only problems he identified in the letter were "leaking roof," "continually racing engine," radio static, and a "roll bar that pops up whenever I hit pot holes." MBNA replied, writing that the New York regional field manager would become involved.
On September 20, Lotito returned to Catena, complaining about the rotten egg smell and the engine surging while idling. The idle was considered normal; however, Catena did replace the ignition control unit and the ignition control device to ameliorate the rotten egg smell. The car spent four days in the shop.
On October 14, the car was brought in for a regular servicing during which the *485 radio receiver was replaced. The car was in the shop for five days.
On February 9, 1995, the car lost power and stopped while Lotito was driving on a highway. According to Catena there were problems with the computer. Repairs to the crank shaft and replacement of the spark plugs fixed the problem, and the car was returned to Lotito three days later.
On May 11, Lotito brought the car in for its regular 30,000 maintenance and complained about the rotten egg smell and some other minor problems. He was advised that the smell was probably caused by the quality of fuel he was using. The car was returned after six days.
On or about June 26, the car would not start. It was towed to Catena, where an alternator and a battery were replaced. According to Lotito's brief, the car was returned four days later.
On July 10, 1995, Lotito sent the last payment he would make on the lease, which would not expire for almost two years. Over two months later, on September 21, his attorney wrote to MBNA, describing the car as a "lemon" and requesting help. MBNA offered to examine and repair the car, and Lotito testified that he agreed to "allow them ... one more time to fix my car, but this is the last straw."
On October 2, 1995, what all parties describe as the "last chance opportunity to repair" the vehicle began at Catena under the supervision of MBNA. The car was in for about three weeks, during which MBNA provided Lotito with free use of a Lincoln Continental. The entire car was surveyed, and the only problem noted was an accumulation of carbon deposits on the valves. This caused the car to idle improperly, but, according to MBNA/Catena witnesses, this condition had nothing to do with Lotito's earlier complaints about occasional fast idling, which they claimed was a normal aspect of this car's functioning. According to them, the carbon deposits were a normal by-product of burning fossil fuels and did not suggest any inherent problem with the engine. By then the car had been driven over 33,000 miles, and the witnesses said that the repairs performed to remedy this condition were, therefore, not unusual, although they were expensive, costing MBNA almost $9,000.
According to Lotito, a couple of weeks after he picked up the car, "the engine started to race, the rotten egg smell started to happen, and I just figured at that point this was a merry-go-round." At about this time, he received a notice from MBCC advising that it was going to institute suit and repossess the car. Lotito left a message on a MBCC answering machine outlining the problems he had experienced with the car and offering to return it. On November 14, 1995, MBCC filed suit. In a certification opposing MBCC's attempt to repossess the car, Lotito said: "I would be willing at this time to pay the lease payments in escrow to anyone appointed by this court until the completion of this case and repair of the car." The court ordered Lotito to return the car, which he did on January 25, 1996. By then, MBNA had paid about $23,000 in warranty repairs, and the odometer reading was 34,756 miles.
Lotito's case essentially rested on his own testimony and the repair records. He offered no expert testimony. By contrast, MBNA/Catena offered a considerable amount of expert testimony. In essence, that testimony indicated that the idling "problem" that bothered Lotito was a natural function of the engine and that the rotten egg smell was common in European-made cars and other cars. The smell was identified as not being attributable to the engine but coming "from the exhaust system, due to a byproduct of combustion of the fuel, high-sulfur content fuels. You burn the fossil fuels you get sulfur dioxide out the exhaust pipe." The catalytic converter was replaced because of the possibility that there had been a build-up of sulfur in it. Although occasionally replacing the converter seemed to "lessen the severity" of the smell, as of early February, *486 MBNA adopted a policy of declining to replace this part because it was satisfied that replacement would not eliminate the smell. With respect to the amount of time the car was in for each repair, there was testimony, unrebutted by Lotito, that on many occasions he had not picked up the car when it was ready. Sometimes that was because Catena had given him another car to use until his car was repaired.
In March 1996, the car was sold to a car dealer at auction for $60,700. Before sale, the car was assessed by the auctioneer's mechanics as being in average condition, with a smooth engine and transmission, and good brakes, steering, and battery. The "black book value," i.e., the average wholesale value of an average 1993 500SL Mercedes, was then $58,600. Two months later, the car was resold to a Michigan car dealer for $62,200.
MBNA maintains computerized records for all warranty repairs of its vehicles, no matter where or when the repairs are made. Those records indicate that from October 20, 1995 to April 1998, no one had applied for repairs under the warranties, which continued in effect for four years or 50,000 miles, whichever came first.

II
The trial judge resolved the Lemon Law claim against Lotito based on the following findings of fact and conclusions of law.
After the last repair attempt [referring to October 1995] ..., Mr. Lotito testified that ... the engine raced and he also mentioned the rotten egg smell. The repair records indicate that Mr. Lotito complained of the rotten egg smell a few ... times, not continually throughout the use of this car. Also, before October 2nd to the 20th of 1995, the last repair attempt, the last record of ... an idle complaint was in September of `94. No expert evidence was presented that the failure to start problem which did occur after September of `94as I rememberare related to the engine idle complaint.
Furthermore, Mercedes-Benz testified that the ... rotten egg smell was common and the normal function of this type of car, it's not a defect in the car according to the Mercedes-Benz evidence. The smell may lessen depending on the gas mixture. There was no expert provided by Mr. Lotito ... contest[ing] that evidence.
Now, the car was auctioned and sold a few times after it was returned by Mr. Lotito, all sales were in excess of the car's wholesale value. And at the first auction an[] inspection formindicated that the engine and transmission were smooth. No further complaints concerning the car were made, and no further warranty work was requested for this car, although it was still subject to the manufacturer's warranty after Mr. Lotito returned it.
When Mercedes-Benz Credit Corp. attempted to replevy the car after Mr. Lotito stopped paying on the lease, Mr. Lotito objected and essentially fought the request. He did offer to pay the lease in court until the warranty litigation was concluded.
I conclude from this evidence that the only problem that continued past the last repair effort was the rotten egg smell, but that smell, in my opinion, did not substantially impair the use, value, or safety of the car. According, I do not believe that a case on the lemon law has been made by Mr. Lotito.
Our appellate function is limited. We cannot "`disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974) (citing Fagliarone v. Twp. of No. Bergen, 78 N.J.Super. 154, 155, 188 A.2d 43 (App.Div.1963)).
*487 There was, of course, no evidence that the value or safety of the car was affected by the occasionally experienced rotten egg odor. Indeed, MBNA submitted unrebutted fact and expert testimony on these points, including evidence that the car was resold for more than its book value shortly after Lotito returned it.
The remaining question is whether the use of the car was substantially impaired. Perhaps it is worth noting in that regard that in summation to the jury, although Lotito's attorney mentioned the rotten egg smell as one of two major problems, he said, "The most important issue in this case deals with the idling...."
The judge found on adequate evidence that the idling problem had been repaired by September 1994, and that Lotito had complained about the rotten egg smell on only a few occasions and "not continually throughout the use of the car." Although Lotito's testimony might be understood as indicating that the problem was more extensive, the trial judge was entitled to disbelieve him. After all, the car was purchased in June 1993, and the only record of rotten egg smell complaints were on April 4, May 3, and September 20, 1994, and May 11, 1995. And on August 4, 1994, when Lotito wrote to MBNA for the first time, he mentioned a number of problems but made no reference to the rotten egg smell.
The judge also found persuasive the unrebutted testimony of MBNA's experts that this "problem" was common and was unrelated to any defect in the car. The record does not provide any reason for rejecting that finding.
Therefore, we affirm the judgment dismissing Lotito's Lemon Law claim. We note in passing that the judge's conclusion with respect to the insubstantiality of Lotito's complaint accords with the result reached in a similar case by the Division of Consumer Affairs. Picarelli v. Hyundai Motor of Am., Inc., 95 N.J.A.R.2d (CMA) 115, 1995 WL 271158 (Div. of Consumer Affairs).[1]

III
Lotito's claims for breach of express and implied warranties are governed by the Uniform Commercial Code, N.J.S.A. 12A:2-101 to -725.[2] He contends that he revoked acceptance of the car because its nonconformities substantially impaired the value of the car to him. In General Motors Acceptance Corp. v. Jankowitz, 216 N.J.Super. 313, 523 A.2d 695 (App.Div.1987), we observed:
Another intangible factor to determine whether a "nonconformity substantially impairs [the value of the goods to the buyer], N.J.S.A. 12A:2-608(1), (emphasis supplied), is whether the nonconformity is such that it `shakes the buyer's confidence' in the goods."

[Id. at 338, 523 A.2d 695.]
We added that
[a]n unreasonable length of time to repair defects may also have the effect of impairing usefulness of the product for a *488 substantial length of time; defects which might otherwise be deemed minor may thus have a substantial impact upon the buyer.

[Id. at 339, 523 A.2d 695.]
We also pointed out that "[n]ormally it is a question of fact whether the seller's breach substantially impaired the value of the contract to the buyer." Ibid. (citation omitted).
Of course, revocation of acceptance must occur within a reasonable time after discovery of the defects, N.J.S.A. 12A:2-608(2), but continued use of the goods after the defects appear does not necessarily deprive the buyer of the right to resort to revocation of acceptance. Fablok Mills, Inc. v. Cocker Mach. & Foundry Co., 125 N.J.Super. 251, 257, 310 A.2d 491 (App.Div.), certif. denied, 64 N.J. 317, 315 A.2d 405 (1973). Whether the continued use is reasonable or not is a matter for the finder of fact. Ibid.
These principles of law clearly justified submission of Lotito's case to the jury. Unfortunately, errors in the charge and inconsistencies in the jury verdict form resulted in a verdict that cannot be permitted to stand.
With respect to liability, the main problem in the charge was that it limited the jury's consideration of revocation to the express warranty. But, the express warranty in question not only did not exclude implied warranties, it acknowledged them for the same time period covered by the express warranty. Thus, under these circumstances, Lotito was entitled to prove revocation of acceptance if either the express warranty failed of its essential purpose or if the implied warranty of merchantability was breached, Palmucci v. Brunswick Corp., 311 N.J.Super. 607, 612-14, 710 A.2d 1045 (App.Div.1998), provided that the continued use was reasonable and the nonconformities substantially impaired the value of the car to him.
The error in the charge was repeated in the special interrogatories given to the jury and in answers to questions the jury posed during deliberations. The interrogatories and the answers were as follows:
Question 1 asked:
Did [MBNA/Catena] breach the express warranty to make any repairs or replacements necessary to correct defects in material or workmanship?
The jury's answer was "no."
Question 2 asked:
Did [MBNA/Catena] breach the implied warranty to supply a merchantable leased vehicle?
The jury's answer was "yes."
Question 3 asked:
Was [MBNA/Catena's] breach of the express or implied warranty material?
The jury's answer was "yes."
The form included the comment at that point that if the breach was material, Lotito would be excused from paying MBCC the $34,443.13 reflected in the partial summary judgment.
Question 4 asked:
If [MBNA/Catena] materially or nonmaterially breached the express or implied warranty, please state the sum of money, if any, Mr. Lotito should be awarded which reflects the difference between the value of the use of his car as accepted and the value of the use of the car if it had been as warranted:
The jury's answer was "$0."
Question 5 asked:
If there has been a breach of the express warranty, please answer whether Mr. Lotito revoked his acceptance of the lease and, if so, whether his revocation was justifiable because the value of his use of the leased vehicle was substantially impaired?
The jury's answer was "yes."
Question 6 asked:
If Mr. Lotito justifiably revoked his acceptance of the lease, he will be relieved of his $34,443.13 obligation and please *489 also state the amount of money, if any, which he should justly receive as a refund from the amounts he paid on the lease ($13,603 trade in; $2,058 down payment; and $34,475the 25 lease payments he made):
The jury's answer was "$8,000."
During deliberations, the jury asked the judge: "# 5Is this limited to only the express warranty or should it also include the implied warranty?" Unfortunately, continuing the erroneous theory of the original charge, the judge answered, "This does not apply to the implied warranty."
The jury persisted by submitting the following question: "Question # 5 [-] HYPOTHETICALLY SPEAKING, IF THERE HAS NOT BEEN A BREACH OF THE EXPRESS WARRANTY, BASED ON THE WAY THE QUESTION IS WORDED, CAN WE STILL ANSWER THIS QUESTION?" The judge's written response was this:
This question can only be answered if there were promised repairs that were not made or attempts to repair that proved unsuccessful. If you believe this to be the case, then you can go on to decide whether Mr. Lotito revoked his acceptance & if so whether his revocation was justified because the value of his use of the leased car was substantially impaired.
Thus, somewhat ambiguously, the judge in essence recharged that question 5 could only be answered if there had been a breach of the express warranty. Perhaps as a result of the somewhat ambiguous nature of the judge's answer to the second question, the jury decided to answer question 5 despite its answer to question 1 that there had been no breach of the express warranty.
Whatever the cause, we are confronted with answers to questions 1 and 5 that are inconsistent and irreconcilable. Although question 5 should not have been limited to breach of the express warranty, it was, and twice the judge reiterated to the jury in supplemental written charges that question 5 was to be answered only if they had found there had been a breach of the express warranty. The jury was rightly troubled by these charges, as reflected in both its questions, which essentially pleaded for the opportunity to respond to question 5 as if it included the implied warranty of merchantability. But in answer to question 1, the jury found that no express warranty had been breached. Therefore, under the judge's charge it ought not to have answered question 5. But it did, and its answer indicated the view that MBNA/Catena were liable.
"[I]nconsistent and irreconcilable verdicts are fatally defective and should normally be set aside." Brendel v. Public Service Elec. & Gas Co., 28 N.J.Super. 500, 507, 101 A.2d 56 (App.Div.1953). Usually, the underlying reason for vacating the verdict in such circumstances is that "the jury failed to comprehend the issues involved in the trial and, by their verdicts, demonstrated their unfitness to determine the rights and obligations of the respective parties." Ibid. That appears to be the case here, although, as the jury may have sensed, the charge was erroneous. However, we cannot determine whether in answering question 5, the jury decided that there was a breach of the express warranty, thereby ignoring its answer to question 1, or whether it decided to ignore the judge's instructions and give damages for breach of the implied warranty. The inconsistency may not be resolved "by parsing the answers to the special interrogatories, or identifying which of its determinations or answers is critical, or eliminating the erroneous interrogatory from the mix." Theer v. Philip Carey Co., 133 N.J. 610, 624, 628 A.2d 724 (1993). In light of these principles, and the judge's erroneous charge, which constituted plain error because it prejudiced Lotito's rights, cf. Carter-Wallace v. Admiral Ins. Co., 154 N.J. 312, 336, 712 A.2d 1116 (1998), we reverse the judgment on the breach of *490 express and implied warranty, and remand for a new trial.
In passing, we note that the judge's charge and the special interrogatories were also erroneous with respect to the issue of damages following revocation of acceptance. On justifiable revocation, a buyer may "recover so much of the purchase price as has been paid." General Motors Acceptance Corp., supra, 216 N.J.Super. at 331, 523 A.2d 695 (citations omitted). In this case, that is the $13,603 trade in, the $2,058 deposit, and the $34,475 in monthly payments, for a total of $50,136. The claim for any balance due on the lease becomes irrelevant in these circumstances. But, the seller, or lessor, is "entitled to a credit for the value of the use prior to revocation." Id. at 339, 523 A.2d 695 (citations omitted).
Thus, it is clear that question 6 did not frame the issue correctly since it failed to indicate that Lotito was entitled to damages in the amount he paid for the car. Moreover, the judge had charged the jury that on all issues Lotito had the burden of proof. But that is not entirely so with respect to damages. Lotito was required to prove what he had paid, and he did that. He was not required to prove the credit to which the other side was entitled for the value of his use before revocation. See James J. White & Robert S. Summers, Uniform Commercial Code, § 8-3 at 454 (4th ed.1995), wherein the following observations are made:
Presumably, since the breaching party (the seller) is the "bad guy" the court should not be generous to the seller but should leave the seller the burden of coming forward with credible evidence to show that it is entitled to an offset by proving the value of the benefit conferred on the buyer.
No case is cited by White and Summers and our research has not revealed any case directly addressing the issue of who should bear the burden of proof on the issue of the value of use before revocation under the Uniform Commercial Code. However, their position is supported by reference to general principles.
Generally, burdens of proof are not allocated in statutory law but are left to the courts as matters of procedure. In re Will of Smith, 108 N.J. 257, 264, 528 A.2d 918 (1987). Judicial allocation of the burden of persuasion "can vary depending upon the type of proceedings, the comparative interests of the parties, the relative litigational strengths or weaknesses of the parties, the access of the parties to proof, and the objectives to be served by the evidence in the context of the particular proceeding." Romano v. Kimmelman, 96 N.J. 66, 89, 474 A.2d 1 (1984).
Obviously, the lessee has no interest in establishing the value of the use of the vehicle and the lessor has every interest in proving that the value of the use equaled or exceeded the amounts paid by the lessee. In addition, the lessor, because of the nature of its business, is in a far better position to provide evidence of the value of use. Although generally the party seeking damages has the burden of proof, Caldwell v. Haynes, 136 N.J. 422, 436, 643 A.2d 564 (1994), Lotito should be viewed as having satisfied that burden by proving what he had paid. The burden of proving the claimed offset for the value of use fairly belongs on the party in breach in these circumstances. Cf. Block v. Diana, 252 N.J.Super. 650, 657-58, 600 A.2d 520 (App.Div.), certif. denied, 127 N.J. 564, 606 A.2d 375 (1992).

IV
On the eve of trial, Lotito asked for permission to amend his counterclaim and third-party complaint to add claims based on the Consumer Fraud Act. The request was made orally without the benefit of the required notice of motion. R. 4:9-1. It was denied by Judge Rebeck, who did not preside at the trial. We affirm that ruling because the issue was not properly presented to Judge Rebeck and *491 substantially for the reasons stated by Judge Rebeck in his oral ruling of May 15, 1998. See Sun Source, Inc. v. Kuczkir, 260 N.J.Super. 256, 615 A.2d 1280 (App.Div.1992), certif. denied, 133 N.J. 439, 627 A.2d 1144 (1993), where, in similar circumstances, we made the following observations.
We are convinced that the trial court properly exercised its discretion by denying defendant's motion to amend her pleadings to include claims based on violations of the Consumer Fraud Act. Defendant delayed over two years before asserting these additional claims. It was only after the case was scheduled for trial and then only three days before the scheduled trial date that defendant moved to include the Consumer Fraud Act claims. Moreover, defendant twice defaulted, first for failure to file an answer to the complaint and later, for failure to answer interrogatories. Despite a change in counsel, the substituted attorney handling the matter had the case for over a year.
Beyond this, defendant's dilatory tactics prejudiced plaintiff. As the motion to amend the pleadings was made only on the eve of the trial, discovery had not been undertaken with respect to these issues. The Consumer Fraud Act claims exposed plaintiff to greater liability by potentially holding it responsible for treble damages and counsel fees. Thus, to permit an amendment to assert these new and different causes of action would have necessitated greater and more extensive discovery and further delayed the trial. The matter was already pending in the court for over two years without these readily discernable claims being raised. Thus, because of defendant's lengthy and inexcusable delay in moving prior to the eve of trial to amend the pleadings to include the Consumer Fraud Act claims and the clear prejudice to plaintiff, the trial court's ruling did not constitute a manifest injustice or abuse of judicial discretion.
[Id. at 263, 615 A.2d 1280 (citations omitted).]
Lotito nevertheless asks us to grant him permission to amend his pleadings to add counts for consumer fraud, citing Coastal Group, Inc. v. Dryvit Systems, Inc., 274 N.J.Super. 171, 180, 643 A.2d 649 (App.Div.1994). That case holds that an appellate court may itself direct that a party be permitted to amend pleadings on remand even if the amendment had been properly denied by the trial court. Id. at 180-81, 643 A.2d 649. But the power should only be exercised where it is clear that an undue burden will not be imposed on the other party. Id. at 181, 643 A.2d 649. For example, in Coastal the parties would have had to conduct extensive discovery anyway on other issues, and the court felt that the addition of discovery proceedings with respect to consumer fraud would not be an undue burden. Ibid. That does not appear to be the case here. Therefore, we decline Lotito's request; but we do so without prejudice to his making an appropriate application to the trial judge on remand.

V
Catena's cross-appeal urges that the case against it should have been dismissed. Its argument in this regard is based on the warranty limitation that was found to be unconscionable in the first appeal. Mercedes-Benz Credit Corp., supra, 306 N.J.Super. at 33, 703 A.2d 288. Therefore, we reject the argument and remand for trial as to both MBNA and Catena as well as MBCC.
Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.
NOTES
[1] In that case the Administrative Law Judge, whose findings were endorsed by the Division of Consumer Affairs, said:

I find that petitioner's complaint about a rotten egg smell is not contrived or non-existent, but I do believe that it has been exaggerated for self-serving reasons.... My opinion is that the rotten egg smell does not occur every day and is not as pungent as petitioner alleges.... Those odors to the extent that they exist, result from the additives passing through the catalytic converter, as testified to by Rehm and Boujotas, and confirmed in the document ... captioned HYDROGEN SULFIDE (rotten egg odor). That document again indicates "this is not an abnormal condition. No repair should be attempted."
In essence, that is the same conclusion reached by the Law Division judge in this instant case.
[2] The UCC was amended effective January 10, 1995, by the addition of a new article specifically applying to leases. N.J.S.A. 12A:2A-101 to -532. But the new article is inapplicable to the instant transaction since it occurred before the act's effective date. L. 1994, c. 114, § 12.